ANDREW RIEGEL, Appellant, v. E. S. ORMSBY.

**Reformation:** ESTOPPEL TO DEMAND. Where mortgages, deposited with trustees to secure debenture bonds of a certain company, were executed so as to render the person signing them personally liable, purposely to conceal the fact that they were the obligations of the company, such person, though holding merely the naked legal title to the property pledged, and receiving no consideration for signing the obligations, is without standing in a court of equity to ask a reformation of the mortgages so as to be relieved from personal liability, even though all the facts had been known to the trustees and purchasers of the bonds.

ASSIGNMENT BY ONE WITHOUT KNOWLEDGE OF DEFENSE: *Assignee with knowledge.* The fact that when one purchased paper he

was informed that the person who signed it claimed not to be personally liable thereon cannot avail the latter when sued thereon, where such purchaser's assignor had the right to enforce such personal liability.

Contracts: CONSIDERATION. The detriment to the promisee is a sufficient consideration to support an obligation purchased on the strength of the promisor's execution thereof, as against the latter, even though he received no consideration.

Representations: ESTOPPEL TO DENY. Where an advantage has been acquired because of representations made by one, he cannot be heard to say that those representations were not true.

Signatures: PERSONAL LIABILITY. The signature to an instrument, "E. S. O. Trustee," creates a personal liability of the signer of such instrument.

*Appeal from Palo Alto District Court.*—HON. W. B. QUARTON, Judge.

THURSDAY, APRIL 12, 1900.

ACTION to recover upon certain agreements extending the time of payment of four promissory notes, in which said agreements it is claimed defendant assumed and promised to pay such notes. The agreements were signed by E. S. Ormsby, trustee, and the defense is that he is not personally liable thereon, and by cross bill it is asked that they be reformed. The cause was tried as an equitable action. There was a decree in defendant's favor, and plaintiff appeals.— *Reversed.*

*J. G. Myerly* for appellant.

*B. E. Kelly* and *Carr & Parker* for appellee.

WATERMAN, J.—The case was submitted in great part upon stipulated facts. The statement in the record is so lengthy we shall venture to abridge it. Some additional matters of which testimony was taken will be noticed in the course of the opinion. In the year 1884 the defendant was a member of three firms, each of which was engaged in the

real estate and loan business. The place of business of one of these firms was at Emmetsburg, in this state; the other two were located in South Dakota. The Dakota firms had made loans to and taken notes secured by deeds of trust upon real estate from Daniel R. Haynes, Patrick Kelley, Jesse H. Conrad, and Josiah W. Lamb, respectively. The defendant was the trustee named in these deeds. In June, 1885, the American Investment Company was organized, and absorbed the business of all these firms. Defendant was president of the company until July 1, 1891, and thereafter was a member of its board of directors. In each of the loans mentioned except that of Kelley, the borrowers gave notes for commission, and executed second mortgages to secure their payment. Default having been made by each of these four debtors, foreclosure proceedings were instituted, the real estate sold, and title taken in the name of E. S. Ormsby, trustee, but without his knowledge at the time. In all except the Kelley case the foreclosure was had of the commission mortgages. In the Kelley matter the foreclosure was of the principal mortgage, the only one given. The investment company took up these various loans, and defendant, in his name, as trustee, executed new interest notes or coupons in each of these cases covering a period of five years after the date of the maturity of the original notes. In each of these coupons the principal note was described, followed by this agreement, "Which note I assume and agree to pay." These interest notes were signed, "E. S. Ormsby, Trustee." A separate agreement as to each note was also signed in the same manner by defendant, and also by the original payee, in which the time of payment of the principal was extended for the period just mentioned; and in this agreement it was recited that Ormsby, trustee, was the owner of the land. Prior to this time, the investment company, desiring to issue its debenture bonds for sale on the market, undertook to make provision for securing their payment, and to do this it appointed George H. Carr, Elden J. Hartshorn, and John

J. Watson, trustees, who, by agreement, were to take and hold securities as collateral for the benefit of purchasers of such bonds. These notes, with the extension agreements and the new interest coupons, were in due time deposited with the trustees as collateral, and together with other paper, and debenture bonds aggregating a large amount were placed on the market and sold. The original notes in question were payable two to one Higgins, and two to one Graves, and were endorsed by their respective payees in this form: "Pay to the order of ————, without recourse," and this was duly signed. In December, 1896, the investment company, hav-ing defaulted in the payment of its debenture bonds, the trustees named, Carr, Hartshorn, and Watson, sold the col-laterals at public sale, and plaintiff purchased, and now owns, the Haynes, Conrad, Lamb, and Kelley notes, with the agree-ments relating thereto, of which we have spoken. This action is an attempt to enforce a personal liability against Ormsby.

II. On the face of these papers Ormsby is personally liable. Counsel do not disagree as to this. The ultimate question presented for our determination is as to defendant's right to have the contracts reformed. Preliminary to this, however, a number of other issues are raised by the defense. It is maintained that these extension agreements and promises to pay, made by Ormsby, were without consideration; that the papers sued on were non-negotiable; that Ormsby was not the real owner of the real estate covered by the mortgages, but held only the bare legal title for the benefit of the investment company; that he did not intend to incur any personal responsibility in signing the agreements and coupons; that the liability thereon was in fact that of the investment company, and that the trustees for the debenture creditors knew these facts when they re-ceived this paper; and it is claimed this notice to the trustees will, in law, be deemed notice to their *cestuis que trust*. Upon the question whether notice to trustees of this character

is notice to the beneficiaries, the authorities seem to be in conflict. As we dispose of the controversy on other grounds, we need not analyze the cases, nor do more than say that in each of those cited by defendant the question arose between creditors whose rights were in conflict, while here the issue is between a creditor and one who had a duty to perform in creating the trust. But, for the purpose of this case, let us say the holders of the debenture bonds were bound by any knowledge had by the trustees of facts which affected the validity of such securities, and it then becomes necessary to determine what the facts were as to the execution of these papers by Ormsby, and what knowledge the trustees had. These securities purported to be real estate mortgages, with the personal obligation of Ormsby added. There was a deliberate purpose in having them signed as they were instead of by the investment company. The president of the company, a brother of defendant, and who testified in his behalf, says: "I think the reason we made these extensions in the name of E. S. Ormsby, trustee, instead of the name of the American Investment Company, was that some of them went east to eastern holders of first mortgages, where we held title, or the title was in the name of C. E. Bliven, trustee, or E. S. Ormsby, trustee; and I think we wished them to think as much as possible that it was a straight loan,—all right; that it was *bona fide* collateral; where, if we put them in the name of the company, they might have thought it was not a *bona fide* collateral security. We did not do it particularly to deceive our customers. We guaranteed them, and expected to pay them." If this means anything, it means that these papers were executed by Ormsby so that it might not be known they were obligations of the investment company. While it is true, defendant does not admit this, his denial is hesitating, and not direct, and the statement of the president is corroborated by all the surrounding circumstances. Although in three of the instances these papers might have been treated as col-

lateral, even though the agreements had been signed by the
investment company, because real estate was pledged, they
would have lacked any personal obligation on the agree-
ments outside that of the principal debtor, who was already
bound. But in one case—that of Kelley—the principal
mortgage had been foreclosed. The note was merged in the
judgment, and we have nothing to show but that the judg-
ment was paid by the purchase of the land on foreclosure.
Had the investment company signed the agreement in this
case, it would not have been any security at all. And in
none of the cases would the collateral have been the same,
or so valuable, as it would with the obligation of some third
person added.

Digressing now for a moment, let us see what the trustees
had notice of in relation to this matter. Watson is the only
one of them who testifies on this point. He says: "I knew,
at the time of taking these securities, that the American
Investment Company held the legal title to these lands, and
that they had taken up these securities, and that they were
the owners of both land and securities. Also that defendant
held the naked legal title for the company, and that he
received no consideration for signing these extension agree-
ments; that is, I knew it in a general way. * * * We
did not consider the question of holding E. S. Ormsby per-
sonally liable. * * * At the time we received these
papers, I did not consider E. S. Ormsby was personally
responsible on them." It will be noticed that the witness
does not say that he or any of the trustees knew or suspected
that the papers were executed in Ormsby's name purposely
to conceal the fact that they were the obligations of the in-
vestment company. But, if the facts shown by the testimony
had all been known to the trustees or bondholders, then
knowledge could not aid plaintiff. When these agreements
were deliberately executed in the manner adopted for the
purpose of inducing the bondholders to believe they were the
obligations of a third party, it leaves Ormsby without stand-

ing in a court of equity to ask a reformation that will exonerate him from liability. The conduct of the parties was, in effect, a representation that the investment company was not liable on this paper; that the agreements were the obligations of Ormsby. After acquiring an advantage on the strength of such representation, we cannot understand how Ormsby can be now heard to say these representations were not true. Granted, for the sake of argument, that plaintiff was informed, when he purchased this paper, that Ormsby claimed not to be personally liable thereon, and how does this avail? Ormsby can claim no greater right against plaintiff than against plaintiff's assignors. Had the intention been to express the liability of the investment company by the execution of those agreements, and the failure occurred through mistake of law or fact, doubtless a reformation could be had at Orsmby's instance. *Bank v. Swan,* 100 Iowa 718; *Lee v. Percival,* 85 Iowa, 639. This, however, is not the case. As we have shown, there was no mistake. The manner of execution expressed just what was intended. To permit a reformation here would be to allow defendant to take advantage of his own wrong, and, if no reformation is had, plaintiff is entitled to recover (*Bank v. Swanson, supra,* and cases therein cited), for there was a sufficient consideration for the promise in the detriment to the promisees, the bondholders. The decree of the district court must be REVERSED.