EXCHANGE BANK OF MARCUS, and EDMONDS & LONDERGEN, Appellants, v. J. E. SCHULTZ, Appellee.

**Negotiable instruments:** SIGNATURE: PERSONAL LIABILITY: FRAUD AND MISTAKE: EVIDENCE. Where an officer of a corporation signs his name to a corporation note in such manner as to indicate a personal liability, equity will not relieve him from such liability, except upon a clear and satisfactory showing of a mutual mistake in failing to sign the same in an official capacity, or that the mistake was alone that of the officer of which the payee took a fraudulent advantage, or that the signature was obtained by fraud or misrepresentation; and the burden of showing fraud or mistake is upon the party asserting the same. Evidence reviewed and held insufficient to establish fraud or .mistake in signing the notes in question so as to create a personal liability.

*Appeal from Woodbury District Court.*—HON. JOHN F. OLIVER, Judge.

WEDNESDAY, OCTOBER 21, 1914.

ACTION at law upon five promissory notes, executed by the Glendell Dairy Company, by Henry O. Harstad, president, and defendant J. E. Schultz. Defendant pleaded a mutual

mistake in the signing of the notes, in that his signature was appended thereto, not for the purpose of assuming a personal liability, but for and on behalf of the dairy company, and as its secretary; and he asked that the notes be reformed so as to express this intent. The case was transferred to the equity docket and tried to the court, resulting in a judgment dismissing the petition as to two of the notes and plaintiffs appeal.—*Reversed* and *Remanded.*

*Sargent, Strong & Struble,* for appellants.

*E. J. Stason,* for appellee.

DEEMER, J.—The Exchange Bank is a partnership doing business under that name, and composed of plaintiffs Edmonds & Londergan. The Glendell Dairy Company was a corporation, doing business under that name, at the town of Marcus, and at the time material to our inquiry Henry O. Harstad was its president and defendant Schultz was its secretary.

On the 19th day of December, 1911 the dairy company and defendant Schultz executed and delivered to plaintiff three promissory notes for the aggregate sum of $1,500, and on July 15, 1912, they executed two more notes, aggregating the sum of $545. Each of these notes was signed: "Glendell Dairy Company, by Henry O. Harstad, President. J. E. Schultz." This action is upon these notes, each of which is due and unpaid. Schultz is the sole defendant, and he pleaded that he did not sign the notes in his individual capacity; that while he signed in the manner indicated it was solely as secretary of the company, and to bind the corporation and no one else; that he was not indebted to plaintiff and received no consideration for signing the notes; that if they, as signed, impose any legal liability upon him, it was due to his mistake in signing the same without using the words "by" before his name, and "secretary" afterward; and that the failure to use the words was due to a mutual mistake of both payor and payee. He also alleged:

That the plaintiffs by their statements and representations and by the statements and representations of the said Henry O. Harstad, the president of the Glendell Dairy Company, he, the defendant, was led to believe that his signature was to be attached to the said notes for the purpose of completing the corporate signature on account of the fact that he was its secretary, and for no other purpose; that he attached his signature for such purpose and for no other, and if the plaintiffs and the said Harstad sought and did secure his signature to the said notes for any other purpose, it was with the intention of procuring his signature by fraud, and with the intention of perpetrating a fraud upon him, and the obligation he incurred, if any, is fraudulent and void, and the defendant is not bound or liable in any manner personally.

The notes as signed by their terms impose a personal obligation on Schultz, and to escape liability he must show by the testimony that they were signed by him as they now appear, through a mutual mistake of the parties, or that the payee obtained his signature thereto through fraud and misrepresentation; the burden being upon defendant to show the mistake or fraud by clear, satisfactory, and convincing testimony. *Hunt v. Gray,* 76 Iowa, 268.

Again, the mistake must have been a mutual one, or of the defendant alone coupled with such fraud on the part of the payees in taking advantage of the mistake, as in equity will relieve him of responsibility because the payees knew of the mistake on the part of the maker, and fraudulently took advantage thereof. *Marshall v. Westrope,* 98 Iowa, 324.

These propositions are well understood, and the only question in the case is: Has defendant proved the mistake or fraud pleaded by him? The trial court found the defendant liable on the first three notes, amounting to $1,500, but relieved him from liability on the last two, and plaintiffs alone appeal. As the case is triable *de novo,* the only question for our consideration is the correctness of the finding that these last two notes should be canceled, either because of mistake or fraud.

The issues are of fact, and the case is triable anew here,

so we must take the testimony as we find it and render such judgment or decree as the trial court should have rendered.

Defendant testified regarding these two notes substantially as follows:

I never saw Exhibits D and E since I signed them. I signed them on the date they were drawn. Mr. Londergan brought the filled in notes to Mr. Harstad and I for our signatures. I went with Mr. Londergan to Mr. Harstad's house. They were the notes for $272.50 each, and they were signed at Mr. Harstad's house in Sioux City. Mr. Harstad signed the notes first and I signed them afterwards. I was at the house with Mr. Londergan at the time they were signed, and Mr. Londergan, Harstad, and myself were present. The Glendell Dairy Company's name to these notes was attached by Mr. Harstad. I saw him write the name. After that he signed his own name, then the notes were passed over to me for my signature, and I put my name there as I supposed it was in the capacity of the office, and nothing was said in regard to signature, how it should be signed, or what way it should be signed. Not a word was said by Mr. Harstad or Londergan as to the manner in which I should attach my signature, and nothing was said by either of them as to my signing as surety. When I signed these notes, I did not intend to bind myself personally. I intended to sign as an officer and not as an individual. . . . None of this money represents cash borrowed and put on deposit, and I did not personally receive any portion of the proceeds of the notes, and no demand was made on me for the payment of the notes, but demand had been made of the company. . . . With regard to the two notes of $272.50 each, the matter was talked over at Mr. Harstad's residence by Mr. Londergan, myself, and Mr. Harstad. Mr. Londergan came to the office of the Glendell Dairy Company, and said he wanted the matter cleaned up in some way; but there was nothing said about the notes at that time. Q. At that time, he wanted you and the company to pay the indebtedness that existed against the company to Edmonds & Londergan, didn't he? A. Yes, sir. Q. That is what he was after, was the payment of it? A. Yes, sir. Q. What did you say to him with regard to the ability of the company at that time to pay? A. I told him we would go and see Mr. Harstad, as he had the run of the business, and he was not there, and we

would go up to his house.  We went to the house shortly after
noon.  Mr. Londergan came into the office right around 11
o'clock and stayed there perhaps thirty minutes, and he fixed
the time when he should come back.  Mr. Londergan and I
went to Mr. Harstad's house together.  Mr. Harstad's house
was on the west side.  After we got to Mr. Harstad's house,
Mr. Londergan was talking and getting this book account
straightened out, and finally proposed the notes as I under-
stand.  I cannot recall the words used about wanting me to
pay it.  Q. Did he ask you to pay it?  A. Yes, that is the
idea, that he would like to get his money.  Q. What was said
and done with reference to the signing of the notes at that
time?  A. Nothing said, nothing more done; only the notes
were signed up and passed over to me for my signature.  Mr.
Londergan drew the notes up there.  The notes were not drawn
up at our office, and both of the notes were signed by Mr.
Harstad there at that time.  Mr. Harstad signed first and I
afterwards.  I saw the letters which came from the Exchange
Bank of Marcus, relative to the payment of these notes.  There
was no demand, at any time, ever made on me to pay the notes
until the commencement of this suit.  No one had said any-
thing to me about paying the notes individually, until the suit
was commenced. . . .   The notes were signed by me and
were signed on the bottom of the notes, a legal form, and were
also signed on the back, guaranteeing payment.  The notes,
after I became secretary, I signed as secretary, and this note
was turned over and I wrote my name on the back.  In sign-
ing these notes, A, B, C, D, and E, there was never a word
mentioned to me about my becoming surety on them.  I never
knew it until I seen the first notes and got notice in court that
they commenced suit against me.  That is the first I heard they
held me as security for the notes.  That is the first time I
knew it.  The first time I had knowledge that they were holding
me for these notes was when they served notice of this suit.
I knew they held me liable on these notes at the time Mr.
Henderson had the papers and called me up one day that was
before suit was brought.

Harstad testified in substance:

I brought notes to Mr. Schultz to sign.  I wanted him to
sign because all our papers were signed by the secretary and
president of the company.  It was customary for us to have

the papers signed by the president and secretary, and he was secretary at that time. It was not my intention for him to sign so as to bind himself personally. I first saw the two notes for $272 when Mr. Londergan brought them up here. I was sick at that time and signed the notes up here on the table. Schultz was here, and he signed them at the same time as those. The intention in having him sign his name was to complete the corporate signature. At that time he was secretary of the company. It was not the intention of any of us, as far as I know, to have him become personally liable. . . . We did not seek to secure the signature of Mr. Schultz so as to make him personally liable, and he did not get any consideration for signing them, but only a part of the stock of the Glendell Dairy Company.

On cross-examination he said:

These notes for $272.50 each, marked Exhibit D and E, were signed right here on this table. Mr. Londergan, Mr. Schultz, Mr. Ruby, and myself were present when these notes were signed. Mr. Schultz was out there with the rest of us, and these two notes were signed by both of us. Mr. Londergan brought the notes with him. They were drawn up when he came out there. He wanted me to pay the bill these notes were given for, and that was for material and stuff our company had purchased at Marcus. I told him I didn't have the money right then and there, but I said, 'I will try and dig it up, part of it, as soon as possible,' and, of course, I was lying here sick, and the money got very tight and I couldn't take that up. When he was out here, he came for the purpose of getting us to pay these bills. We had some talk about extending them along further. He said, 'You can pay up a little at a time on them.' I think it was in June. It was in July, 1910. The total bill was $540, and I told him we could not pay them, but that I would try and pay half of it in ten days or something like that. He had the notes all drawn up when he came out there. All he did was to lay them down in front of us and Mr. Schultz and I signed them. Mr. Schultz was out there and signed the notes there. It was for the purpose of getting the indebtedness extended along so we could pay later that we gave these notes.

On re-examination he testified:

Mr. Edmonds did not then or at any time ask me to have Mr. Schultz sign the notes as surety, and did not ask me to have Mr. Schultz sign the two notes of $272 as surety. He or the plaintiff did not at any time ask me to give additional personal security on the Glendell Dairy Company notes. The debt for which the $272 notes was given had been incurred some time before, and Mr. Schultz had nothing to do with any of that indebtedness personally.

This was all the testimony adduced for the defendant. Plaintiff introduced the following: Londergan testified, in substance:

I can't tell exactly how long I have known Mr. Harstad, but I first met him when he was negotiating for the purchase of the creamery at Marcus. I don't think he carried any account with our bank or done business with us until December 19, 1911. Before that date, I had had some talk with Mr. Harstad in regard to his placing the account of the Glendell Dairy Company with our people. This was perhaps a month or longer before December 19, 1911. After that conversation, we investigated the financial condition of the Glendell Dairy Company and the defendant Schultz. We took it up in different ways. We asked R. G. Dun or Bradstreet, I don't remember which, for a statement of the standing of the company at that time. We also investigated the matter of Mr. Schultz's responsibility at about that time. I remember of Mr. Harstad's being in Marcus December 19, 1911, and negotiating a loan of $3,200 and $1,500 with our bank. He was there for the purpose of cleaning up with either the Citizens' Bank or the First National Bank. The conversation with him, as near as I can give it, when he came there, was that he said he would like to change the account, but he had to have a certain amount of money, and that he had given a mortgage on the creamery plant to the bank that he had been doing business with for $4,200. On that, $1,000 had been paid, leaving a balance of $3,200. He wanted to give us that as a part of the security. He wanted to give us a mortgage on the plant as it had originally been given before, and I told him I would take a mortgage for $3,200, that we would want additional security on all the horses, wagons, and harness, everything he had there

for the $3,200. That was agreeable. Then he came to talk about $1,500, and I told him that the only way I would loan him the money would be for him to make three notes. He thought he could put it in smaller payments better than larger ones, and I told him we would make three notes of $500 each, if he would get Mr. Schultz to sign them individually. He said he could do that. . . . In regard to the three notes for $500 each, it is my recollection that Mr. Harstad gave a note due on demand, to be used until such time as Mr. Harstad took the notes to Sioux City to have them signed by Mr. Schultz.

Court: Did he tell you he would have Mr. Schultz sign them individually? A. Yes, sir; he did. I told him, when we first talked, that was the only way I would loan the money, and he said he could have that done. He was certain Mr. Schultz would do it. That was the understanding all the way through. He was to take the notes to Sioux City and have Mr. Schultz sign the notes individually, and return them. . . . I prepared the three notes for $500 each at Marcus. They are in my writing, and after they were drawn up they were given to Mr. Harstad and returned to our bank in the course of mail, and I think they were received on the 22d of December. I talked over these loans and the matter of extending credit to the Dairy Company, with my partner, Mr. Edmonds. . . . Exhibits D and E were drawn up by me and the Edmonds & Londergan named in them as payee is composed of myself and I. C. Edmonds. These notes were given for a book account of the Edmonds & Londergan Company for material and coal; that is, building material and coal sold to the Glendell Dairy Company at Marcus. This account was long past due when these notes were given. These notes were signed in Sioux City. I came to Sioux City for the purpose of cleaning this matter up and went to the Glendell Dairy Company on or about the 15th day of July, 1912, to try and get some money and settle up with these people if I could. On this account and others I did not get any money. I talked with the parties, and my first talk was with Mr. Schultz at the Glendell office. The substance of the conversation was that I wanted to get the money if I could get it, and he said they did not have it and could not supply it at that time. I wanted to get some notes so that we could get it cleaned up, if they could get it in that shape so that we could get it off the books at that time. He

said he did not see how they could pay it at that time. They didn't have that much money, or something to that effect, and he suggested a little more time. That was the conversation on the start. The notes at that time was made 10 and 20 days, and he thought they could pay them when they came due. Mr. Harstad was not in the office, and his signature was obtained at his house. Mr. Schultz suggested that we go to the house and get his signature. I wanted Mr. Schultz to go, and he said he did not have time and suggested that Mr. Ruby go, and as a result of that conversation Mr. Ruby and I went out together. When we reached Mr. Harstad's, I told him about the notes, and he thought they could not pay just at the time, and I told him Mr. Schultz would like to have him sign the notes, and he did so. Mr. Ruby and myself and a traveling man were present at the time. The notes were signed there at that time by Mr. Harstad in the manner they appear here. The notes were signed by Mr. Schultz in the Glendell office after Mr. Harstad had signed them for the company. After they had been signed by Mr. Harstad, Mr. Ruby and I returned to the city in a milk wagon of the Glendell Dairy Company. Mr. Schultz was not at Mr. Harstad's house at the time Mr. Harstad signed the notes. The notes were signed at Mr. Harstad's house by him and at the office by Mr. Schultz. . . . I remember the occasion of Mr. Edmonds, Mr. Schultz, and myself having a conversation in the Jackson Hotel in Sioux City on Sunday night. We came to Sioux City that afternoon, after we had been over to Kingsley for the purpose of seeing Mr. Schultz with reference to the matter of these notes. In our conversation we talked about the appointment of a receiver and about Mr. Schultz's obligations and about the amount that he had signed, and he stated that if he had to pay all the notes he had signed he would get after Mr. Harstad. We also talked about the notes that he had signed for the First National Bank of Sioux City and about the amount of paper that he had signed for the Glendell Dairy Company. He stated that he had already signed too much.

Q. Now, Mr. Londergan, at the time these $272.50 notes were taken, being the notes marked Exhibits D and E, what was said with reference to having the notes signed by Mr. Schultz individually, or what was said by you to him requesting his signature to these notes? A. He wanted to go up and get Mr. Harstad's signature, and when he signed them he

said he would sign them. By the Court: He said he would sign them? A. Yes, sir. Q. By the Court: He would have to do that if he was secretary didn't he? By Mr. Struble: Not officially.

There was nothing said with reference to his signing as secretary of the company, and he said nothing to me with reference to signing these notes as secretary of the company. I did not understand that he was so signing them. When I received the notes after they were signed by Mr. Schultz, I understood that they were, what they purported to be on their face, the notes of the Glendell Dairy Company and of Mr. J. E. Schultz. . . . I do not draw all the notes, but I think I drew these notes in controversy. Exhibits A, B, and C are in my handwriting and they are on our regular bank form. The body of the notes have not been changed from what they were when I drew them. I intended when I drew these notes that they should be signed by the different parties. I do not know that I made any mistake in drawing these notes. I do not know that I made any mistake when I drew Exhibits C and F. These notes are just as they were written. I made them just as I make other notes. . . . I had looked up Mr. Schultz's financial standing at the time with the First National Bank of Sioux City, Iowa. A few days before we made out these papers, I was down in Sioux City for the purpose of asking them about it. I asked them if they knew anything about this man's standing, and they told me he was all right. They told me how much he was worth, as near as they could get it. . . . The other notes for $272.50 were signed at Mr. Harstad's residence by Mr. Harstad. I then took them down to the office and Mr. Schultz signed them there. I told Mr. Harstad that Mr. Schultz said he would sign them. He had told me that he would sign the notes, but wanted me to go to Harstad first. I did not ask Mr. Harstad to sign the notes so as to become personally liable. I did not tell him how I wanted the notes signed. I simply told him that Mr. Schultz wanted him to sign the notes. I think upon all the notes I did not indicate to him the way I wanted him to sign. I simply handed him the notes with the understanding that I wanted them signed. I told him that Mr. Schultz wanted him to sign first. . . . I brought the $272.50 notes down to the office of the Glendell Dairy Company. Mr. Ruby and their driver came with me. Mr. Schultz was in the office.

I do not remember just what I said to him. I brought the notes down and he signed them. Before I went to Harstad's, Mr. Schultz said that he wanted me to go up and have Mr. Harstad sign the notes.

By the Court: What made you think when you came back and Schultz signed them, what made you think or conclude that he was taking individual responsibility, or that he was signing them in any other way than for the Glendell Dairy Company? A. I had it in mind all the time. I would not accept the notes at that time without his signing them individually. I do not know that I told him exactly that. I would not accept the note of the Glendell Dairy Company without Mr. Schultz's individual signature. I did not want to extend any further credit to the Glendell Dairy Company. In every instance that I took notes from the Glendell Dairy Company, I wanted Mr. Schultz's individual signature. I took notes signed by the Glendell Dairy Company, H. O. Harstad, president, when they were secured. I do not remember whether I took any others. I did not want to extend any further credit to the Glendell Dairy Company without Mr. Schultz being personally obligated.

Another disinterested witness testified:

I remember Mr. Londergan being in the office of the Glendell Dairy Company some time in July, I think, or at least during the warm weather. I remember going with him to the home of Mr. Harstad in Sioux City. I went with Mr. Londergan from the Glendell Dairy Company office to Mr. Harstad's, and he signed the notes. I do not remember what the amounts were or the dates. I do not remember just when that was. I went with him only upon one occasion when any notes were signed by Mr. Harstad. If I remember right, Mr. Schultz, at this time, said I had better go with him. Mr. Londergan had been in the office in the morning. I don't know if he was there when we were speaking about it; I think he was away from the office after dinner. I don't know anything that was said between Mr. Londergan and Mr. Schultz. I think Mr. Schultz said, as to my going with Mr. Londergan, 'You had better go,' and I said, 'Do you mean to take the car and go on account of Londergan being lame?' and he said he was, and 'You had better go with him,' and so we went and took a street car there. At that time,

there were some notes signed by Mr. Harstad. How many, I do not know. I did not pay any attention to the number or amount of the notes. Mr. Schultz was not present at the time these notes were signed at Mr. Harstad's house. . . . After these notes had been signed by Mr. Harstad, one of the wagons came by, and I told them to wait, we wouldn't be there very long, and we rode down in the Glendell Dairy Company's wagon. Mr. Londergan then returned to the office of the Glendell Dairy Company. I don't remember whether Mr. Schultz was at the office when we reached there. I did not see him sign any notes after we returned from Mr. Harstad's.

Edmonds testified in substance as follows:

Mr. Londergan had the notes Exhibits D and E for $272.50 signed. I had nothing to do with that. Prior to his coming to Sioux City upon the occasion of signing Exhibits D and E, we had had some conversation relative to the securing of payment of this money. Mr. Londergan took these two notes to Sioux City to have them signed by Mr. Schultz individually. Mr. Londergan and I had some conversation with Mr. Schultz in the Jackson Hotel on the Sunday following the receivership of the Glendell Dairy Company, relative to the five notes, Exhibits A to E, inclusive. We talked over the affairs of the Glendell Dairy Company and about Mr. Schultz having signed the notes. I asked Mr. Schultz how much he had already signed, and he said he had signed too much. He said he had signed about $8,000 with the First National Bank, and we talked about the notes that we had, and he said that if he was bound to pay those that he would have to go after Mr. Harstad.

On rebuttal defendant Schultz testified:

In regard to the $272.50 notes, Mr. Londergan came down some time, I would judge about the first week of July, and asked where Mr. Harstad was. I told him he was up at the house sick and that he would not be down that day, although he had been in the habit of coming down every day or two. He wanted to know how he could see him, and asked me if I could go along with him. I told him I would, but for other engagements. I told him I could not go, and asked Mr. Ruby to go with him, and he did. I am positive there were no notes

executed that day. I did not go up with them. They came back and told me what Harstad had said and what they had found out. Mr. Londergan came back at the time the $272 notes were drawn. He asked me if I would go up with him. We took a street car and went up to his house. Before we went up there, there was no conversation about the particular indebtedness which he wanted covered by these notes. Nothing, in fact, was said about the notes while we were going up. After we got there, Mr. Londergan insisted that he would have the money for that account and said he was needing money at this time of the year. He would like a note or money on that bank account, and, if we could not pay the account that day, he wanted to know if we would give notes. I did not say anything. Mr. Harstad said he would give them 10 and 20 days. Then Mr. Londergan pulled out the notes, and Mr. Harstad asked for pen and ink, and Mrs. Harstad brought it. The notes were already made out. . . . There was nothing said to me, wherever the notes may have been signed, as to signing them; they were simply handed over to me for signature. I do not remember signing any notes at the office of the company. I heard the conversation at the Jackson Hotel. The only thing I remember particularly having been spoken was that I said if I was obliged to pay those notes it would be hard on me and I would have to get Mr. Harstad. . . . I don't recollect distinctly whether there was any talk in the Jackson Hotel about me being personally liable on these notes. I would not swear that there was no such conversation. . . . Q. Then you are not sure but what you did sign these $272 and $500 notes at your office? A. I am not so sure, but it was in my mind that I signed them there. Whether I did or not, I could not say. I know the deal was made right there in Mr. Harstad's presence and my own and the three of us. . . . Q. Now, here is this note Ex. 1, for $220, I notice you sign that as secretary of the company, and that was made some six or seven months before these $272 notes were made. I notice you signed the $272 notes with your individual name without designating your office or title in the dairy company. Did you write that 'Sec.' on Ex. 1? A. Yes, sir. By the Court: Well, you knew then it was necessary for you to sign it as secretary? A. Well, I did not suppose it had any bearing to speak of. By the Court: What I cannot understand is why you should sign that as secretary and then afterwards

sign these just as an individual? A. Well, I had probably overlooked it; some one got my attention, you know. By the Court: But you knew if you signed it as an individual you would be responsible on the face of the note? A. I did not know it. By the Court: Then why add secretary to this signature? A. Because there is no one else to add, that is why I put secretary; I knew it because it slipped my mind. I don't think it was important to have secretary on these other notes back of my name. By the Court: Did you give any other notes upon which you were responsible to other people? A. No, sir. Q. Or any banks here? A. Well, I have got notes at banks, Mr. Harstad and I. Ordinarily we used a rubber stencil to sign the company's name. That stencil provides a line for the president to sign. I have the stencil with me. It is the same as was used in signing Exhibit A. I stamped the stencil on Exhibit 1. I don't know whether the company has two different stamps. I got the stamp that was used in signing Exhibit 1 in the office of the company. I got the stamp that was used in signing Exhibit A out of the office yesterday or the day before. I don't know how long it has been at the office. The only purpose that I know these stamps have been used for is the signing of notes.

This is the entire testimony in the case, and it is manifest, we think, that it fails to establish either fraud or mistake in the signing of the two $272 notes. Certainly it is not of that clear and satisfactory nature which the law requires. There is no testimony whatever of a mutual mistake, and an entire absence of evidence showing that plaintiffs intentionally and knowingly took advantage of any mistake made by Schultz regarding his legal liability on the notes as signed. At best, Schultz was simply mistaken as to the legal effect of his signature; but there is no showing that the payees understood he was to sign in a representative character. Indeed, the contrary appears.

Moreover, there is no testimony, as we view it, that plaintiffs knowingly, intentionally, or fraudulently took any advantage of Schultz's mistake as to individual legal liability. There should have been a judgment on all the notes against the

defendant, and the decree and judgment must be reversed and the case remanded for a judgment in harmony with this opinion.

*Reversed* and *Remanded.*

LADD, C. J., and GAYNOR and WITHROW, JJ., concurring.