Consumers Twine & Machinery Company et al., Appellants, v. Mount Pleasant Thermo Tank Company et al., Appellees.

**BILLS AND NOTES:** Form—Signature in Representative Capacity. The officers of a corporation who, in the execution by them of authorized notes in the name of the corporation, as maker, affix their own names to the corporate signature, as "Pres." and "Sec.," respectively, thereby assume no personal liability on the notes.

Weaver, J., concurs specially.

*Appeal from Henry District Court.*—Oscar Hale, Judge.

June 22, 1923.

Action in equity, for the cancellation of a written contract and fifty $1,000 notes. The opinion sufficiently states the issues and facts.—*Affirmed in part; reversed in part.*

*E. E. Wagner* and *J. V. Gray,* for appellants.

*J. C. McCoid, Galer & Galer,* and *Harold L. Beyer,* for appellees.

STEVENS, J.—I. The Consumers Twine & Machinery Company, appellant, and the Mt. Pleasant Thermo Tank Company, appellee, are Iowa corporations. The former, located at Sioux City, was, at all times material to the present controversy, engaged in the business of manufacturing binders' twine and ropes and selling farm supplies. The latter was organized in 1919, for the purpose of purchasing and acquiring by assignment letters patent, particularly of the watering tanks and troughs hereafter described. The patents in question, which were originally issued to Hilmer N. Enholm, were acquired in 1919, by assignment from H. Woods, who acquired the same by assignment from the inventor. On or about November 15, 1919, the Thermo Tank Company, for a consideration of $50,000, evidenced by fifty $1,000 negotiable promissory notes, assigned all territorial rights to the Consumers Twine & Machinery Company, as follows:

"In the states of Iowa, Wisconsin, Montana, and Wyoming, viz.: the counties of all of Nebraska, South Dakota, North Dakota, Minnesota, with the exclusive right to the said second party, his heirs, legal representatives and assigns, to manufacture and use said nonfreezing cement watering troughs and tanks, under the aforesaid letters patent in said territory."

The letters patent covering inventions referred to are designated in the contract as Nos. 1251650 and 1202784.

On November 15, 1920, the Consumers Twine & Machinery Company commenced an action in equity in the district court of Henry County, asking the cancellation of the notes, upon the ground that same were obtained by fraud, and praying a temporary injunction restraining the payee from selling or hypothecating the notes.

J. F. Waterbury, secretary of the Sioux City corporation, was, on May 2, 1921, appointed receiver therefor by the United States district court for the northern district of Iowa. On October 1st following, he filed a petition in intervention, joining in the allegations of the plaintiff's amended and substituted petition, which was filed April 18, 1921, and praying for the same relief as was there asked, on behalf of himself, as receiver of the corporation. Later, the Thermo Tank Company interpleaded George Felsing, president, and J. F. Waterbury, secre-

tary, of the Sioux City corporation, asserting personal liability against them upon the notes. Petitions in intervention were thereafter filed by the Farmers & Merchants Bank of Mt. Pleasant, to which 31 of the notes had been transferred, as collateral security for the indebtedness to it of the Thermo Tank Company; also by Zenas Wolever, who had acquired five of the notes by purchase from C. B. Ballenger; also by L. H. Rinefort, the Grinnell Motor Car Company, H. C. Estes, and C. Lester Short, who also had acquired some of the notes by purchase or as collateral security for the indebtedness of the payee named therein. Issue was joined upon the several petitions in intervention by all of the appellants, who in their separate answers adopted the allegations of the amended and substituted petition of the Twine & Machinery Company, and denied that interveners were purchasers or holders for value.

A trial resulted in the dismissal of the amended and substituted petition of the Consumers Twine & Machinery Company and of the petition in intervention of the receiver. Judgment was entered separately in favor of each of the other interveners for the full amount of the notes held by them against Felsing and Waterbury, except that the judgment in favor of the intervener bank was for $12,775.14, whereas the judgment entered against the corporation was for $31,411.24. The negotiations resulting in the execution of the contract of November 15, 1919, were conducted on behalf of the Sioux City corporation by Felsing and Waterbury, president and secretary respectively, and on behalf of the Mt. Pleasant corporation by Ballenger, Estes, and Woods. All of the defeated parties appeal.

The first knowledge of the tanks, which will be presently described, acquired by Felsing and Waterbury was from Ballenger and Estes, who, as agents for the Thermo Company, were exhibiting them to the public at the Interstate Fair held in Sioux City in the fall of 1919. The tanks are sufficiently described in Exhibit C, which is an article prepared by Ballenger and Estes and published in a bulletin issued by the Twine & Machinery Company, as follows:

"Description of Stock Tanks: An excavation about one foot deep is made for the base or first bottom, which is concrete

four inches thick; next hollow building blocks are placed on the base to form the continued air space across the bottom; the blocks are then covered with four inches of concrete, making the bottom of the tank twelve inches thick, containing a four-inch dead air space. (A dead air space is known to be a great nonconductor of either heat or cold.) Next the forms are set for building the walls by placing the inner form on the outer edge of the blocks and the outer form on the outer edge of the base leaving a four-inch dead air space between the walls. Each wall is four inches thick. The outer wall is three feet high and the inner wall two feet. About four inches below the top of the tank the two walls are joined together making a twelve-inch wall at the top of the tank where the greatest pressure will be. The tank is equipped with two covers, a flat inner cover with a lid on each side which opens to the center of the tank thus giving the stock free access to the water, and a roof cover, neat and durable, which has four doors, two on either side. The doors are easily opened or closed.''

It is alleged in the amended and substituted petition that Ballenger, Estes, and Woods, who joined the other two before the contract was executed, represented and stated to Felsing and Waterbury that the patent fully covered and protected the right to manufacture tanks out of ''cementitious'' material with dead air spaces surrounding the water and having a tube extending through the bottom of the tank into the earth below the freezing point and above the bottom to the proper height; that all of said statements and representations were false and untrue; and that the original letters patent issued to the inventor covered only certain small and immaterial parts of the tank, and did not grant the exclusive right to manufacture tanks of ''cementitious'' material, having dead air spaces surrounding the water, as stated, operating upon a thermo, or nonfreezing, principle. All of the allegations of the amended and substituted petition were denied by appellees.

The evidence shows that the effort of the inventor to secure a patent upon a tank, giving him the exclusive right to manufacture and sell tanks containing the dead air space, as stated, and having a tube extending into the earth, for the purpose of cooling the water in summer and preventing freezing in winter,

upon the theory of the thermo principle, was unsuccessful. His claim was rejected, and the claim allowed, expressed in the vernacular of the patent expert, is as follows:

"1. A cement receptacle having hollow bottom and side walls, a hollow core member formed of rigid material disposed within the bottom wall and including upper and lower plates of different lengths, hollow sectional rigid core members disposed within the side walls of the receptacle and each including spaced plates, the inner plates of the side core members being shorter than the outer plates and engaging the upper plates of the bottom core member and the outer plates of the side core members engaging the lower plate of the bottom core member, horizontal plates connecting the inner and outer plates of the side core members engaging the lower plate of the bottom core member, horizontal plates connecting the inner and outer plates of the side core members and forming closures therefor, spacing members interposed between the plates of the side core members, and a tubular member extending through the bottom of the receptacle and having its lower end embedded in the ground.

"2. A cement receptacle having hollow bottom and side walls, a core member disposed within the bottom wall, core members arranged within the side walls and having their upper ends closed and their lower ends communicating with the core member in the bottom of the tank, there being an opening formed in the bottom wall and in the bottom core member, a bushing seated in said opening, and a tubular member extending through said bushing and having its lower end embedded in the ground."

One of the grounds upon which the claims of the inventor referred to were denied was that they had been anticipated by prior inventors, the names and numbers of their patents being given by the patent office. We shall not enter into a detailed statement or discussion of appellants' claim that the patent issued to Enholm covers only minor parts of the tank, and in no sense grants a monopoly to the inventor of the right to manufacture tanks out of "cementitious" material having dead air space and operating by means of a tube inserted in the earth, upon the thermo principle. The extract quoted will suffice to show what the patent in fact covered. Expert testimony was

introduced upon both sides of this question; and while it is, we think, fairly shown that the Enholm patent is much narrower than all of the parties at the time evidently understood and believed, the evidence does not satisfactorily establish the fraud charged. The tank was exhibited to Felsing and Waterbury as a unit and in sections, so that its construction was shown and the principle upon which it operated was demonstrated. A copy of the application of the inventor and the specifications of the letters patent were furnished appellants, and they had full opportunity to determine therefrom the scope of the patent. This, of course, would not, alone, prevent cancellation of the notes, if the representations charged were established by the facts. The evidence, which is voluminous, and which we cannot set out in this opinion, is conflicting, and we cannot say that the preponderance is in favor of appellants. There can be no doubt that appellants believed that they were acquiring territorial rights to manufacture and sell a valuable product, and one that would be attractive to their large number of stockholders, all of whom are farmers, and to other tank users, and that a profit could be realized, either from the sale of territorial rights or of the tanks; but the relief sought can be granted only upon the ground that the notes were obtained by fraud. Immediately after the written contract of 1919 had been executed, Ballenger and Estes were employed by the Sioux City corporation to sell territorial rights, and they continued in its employment until differences arose because of the refusal of the officers of the corporation to approve a sale of a part of the territory for a consideration of $40,000. Both Ballenger and Estes testified that they had but recently been employed by the Thermo Tank Company to exhibit the tank at fairs and to sell territory for it, and that they were not familiar with the invention or the extent of the monopoly granted by the patent. They were, however, experienced salesmen. We are inclined to the belief that appellants largely took for granted that the patents covered the desirable features of the invention. The record does not convince us that such fraud was practiced as will justify the cancellation of the notes. This conclusion disposes of all the questions argued, except the contention of Felsing and Waterbury that no judgment should have been entered

against them personally. It is unnecessary to cite or review the many authorities cited by counsel. Our conclusion upon this point rests entirely upon the facts.

II. All of the notes read, "We promise to pay," and are signed, "Consumers Twine & Machinery Company, Geo. Felsing, President. J. F. Waterbury, Secretary. P. O. Sioux City, Iowa." It is contended by appellants that the personal judgment entered against Felsing and Waterbury on these notes in the court below is erroneous, and should be set aside upon the ground that their signatures clearly indicate that they signed the same in their capacity as officers of the corporation, and that the obligation was intended to be that of the corporation only. Section 20 of the Uniform Negotiable Instruments Law, Section 3060-a20 of the Supplement to the Code, 1913, is as follows:

"Where the instrument contains, or a person adds to his signature, words indicating that he signs for or on behalf of the principal, or in a representative capacity, he is not liable on the instrument if he was duly authorized; but the mere addition of words describing him as an agent, or as filling a representative character without disclosing his principal, does not exempt him from personal liability."

Although variously stated by the court, it has always been the law of this state that, if the name of the principal and the relation of agency or other representative capacity be stated or indicated in a writing executed by an agent or other person in a representative capacity by and with the authority of the principal, the obligation is that of the principal, which alone is bound thereby. *Baker v. Chambles*, 4 G. Gr. 428; *Harkins v. Edwards & Turner*, 1 Iowa 426; *Winter v. Hite*, 3 Iowa 142; *Lyon v. Adamson*, 7 Iowa 509; *Harvey v. Irvine*, 11 Iowa 82; *Wheelock v. Winslow*, 15 Iowa 464; *Lacy v. Dubuque Lbr. Co.*, 43 Iowa 510; *Bryan v. Brazil*, 52 Iowa 350; *Wing v. Glick*, 56 Iowa 473; *American Ins. Co. v. Stratton*, 59 Iowa 696; *Revolving Scraper Co. v. Tuttle*, 61 Iowa 423; *Heffner v. Brownell*, 70 Iowa 591; *Stevenson v. Polk*, 71 Iowa 278; *McCandless v. Belle Plaine Canning Co.*, 78 Iowa 161; *Lee & Jamieson v. Percival*, 85 Iowa 639; *Mathews & Co. v. Dubuque Mattress Co.*, 87 Iowa 246; *Day v. Ramsdell*, 90 Iowa 731; *Capital Sav. Bank & Tr.*

*Co. v. Swan*, 100 Iowa 718; *Riegel v. Ormsby*, 111 Iowa 10; *Hanna v. Wright*, 116 Iowa 275; *Western Scraper Co. v. Stickleman*, 122 Iowa 396; *Exchange Bank v. Schultz*, 167 Iowa 136; *Schuling v. Ervin*, 185 Iowa 1.

While not particularly pertinent to the present discussion, it may not be out of place to recall that a note which does not express the intention of the parties in this respect, or show the capacity in which the same was signed by an agent, officer of a corporation, or other personal representative, may be reformed in equity so as to express the intention of the parties. See cases cited supra.

Under Section 3060-a20, and the uniform holding of this court, the intention of the agent, officer of a corporation, or other person signing in a representative capacity may· be shown by the form of the signature or in the body of the instrument, as in *Baker v. Chambles, Lyon v. Adamson,* and *Harvey v. Irvine,* supra. Whatever conflict or lack of harmony may exist in our decisions upon this point arises wholly out of the application of the principle stated to the facts of the given case, and not out of any intentional departure from the recognized rule.

The court below evidently followed *Heffner v. Brownell,* supra, and similar subsequent cases. The court in the *Heffner* case held the Independence Manufacturing Company (the name of the corporation signing the instrument) and Brownell, who followed his signature with the abbreviation "Pres.," and Sanford, whose signature is followed by the abbreviation "Secy.," all liable. The defendant Brownell alone appealed. The question in that case was not, therefore, whether the corporation was liable, but whether both the corporation and the appellant should be held. The court said:

"In the case at bar, it may be conceded that the Independence Manufacturing Company is bound, and still the question remains whether the defendant is not, also. The note purports on its face to be the note of all the persons, including the corporation, who executed it. There is nothing on the face of the note which indicates that the defendant signed it as president of the manufacturing company, and for it."

The language quoted from the opinion would seem to indicate the view of the court to have been that, since appellant

and Sanford had failed to specifically designate that they were president and secretary, respectively, of the Independence Manufacturing Company, there was nothing upon the face of the note or in the form of the signature to indicate to a transferee an intention upon their part to bind only the corporation. It is true, as will appear from a reading of many of the cases cited supra, that, where one signs a note and affixes to his signature only some such designation as "president," "secretary," or "agent," such designation will be treated as *descriptio personae*, and the party signing will be held liable. But it is difficult to perceive how anyone could be misled where the name of a corporation is followed by signatures to which are affixed the proper abbreviations of the officers usually and customarily signing the obligations of such corporation.

The soundness of the conclusion reached in *Heffner v. Brownell* and other similar cases has been at least twice questioned by this court. The writer of the opinion in *Hanna v. Wright*, supra, referring to the rule, but without mentioning *Heffner v. Brownell*, said:

"Some of our cases sustain plaintiff's contention [that is, that such words as "president" and "secretary," following a signature, preceded by the name of a corporation, are simply *descriptio personae*], but the court, as now constituted, has grave doubts of the correctness of those decisions."

And again, the court, in *Western Scraper Co. v. Stickleman*, supra, said:

"The court as now constituted would favor the conclusion reached by the dissenting judges in the *Mathews* case, but the question need not now be further considered."

The first reference in any subsequent opinion of this court to *Heffner v. Brownell* is in *Farmers' Nat. Bank v. Hatcher*, 176 Iowa 259. The question now before us was not, however, involved in that case. The rule previously adhered to by this court that parol evidence is inadmissible to show that a party who follows his signature only by some such designation as "Pres." or "Secy." was, in fact, the president or secretary of the corporation, and that the transaction was solely for its benefit and was intended to bind it alone, was overruled, and the dissent of former Justice Kinney in *Mathews v. Dubuque*

*Mattress Co.*, 87 Iowa 246, was declared to state the better rule upon this point. The case is next referred to in *Schuling v. Ervin,* supra. Mr. Justice Weaver dissented from the conclusion of the majority in that case, and much that is said by him in argument is in harmony with the conclusion reached upon this point in this case. The reference in the *Schuling* case to *Heffner v. Brownell* was for the purpose of showing by comparison that the court went much further in that case than it was necessary for the court to go in reaching the same result in the *Schuling* case. The signatures upon the instruments in the two cases were wholly dissimilar, and the court did not, in terms at least, reaffirm or approve the doctrine of the *Heffner* case. The signature affixed to the note involved in the *Schuling* case did not disclose a definite principal, and was signed: "Trustees of the Second Christian Church, I. S. Ervin, R. C. Moulton, Chairman, M. L. Everett." The designation of the signatures is, at most, that of Ervin, Moulton, and Everett, trustees of a Second Christian Church. This case is not an authority for appellees, as contended by them.

An interesting discussion of the rule under consideration will be found in 17 Banking Law Journal 303, in which *Heffner v. Brownell* and *Day v. Ramsdell* are referred to with disapproval. We have cited above most of the leading cases in this state, a careful reading of which will show that the court has adhered consistently to the rule stated. The holding of the court in *Heffner v. Brownell* and *Day v. Ramsdell* and perhaps some other cases clearly goes beyond the present statute, and is out of harmony with what would seem to be the great weight of authority. *Peabody School Furn. Co. v. Whitman,* 6 Ala. App. 182 (60 So. 470); *Wilson v. Fite,* (Tenn.) 46 S. W. 1056; *Myers v. Chesley,* 190 Mo. App. 371 (177 S. W. 326); *English & Scot. Am. Mtg. & Inv. Co. v. Globe L. & T. Co.,* 70 Neb. 435 (97 N. W. 612); *American Nat. Bank v. Omaha Coffin Mfg. Co.,* (Neb.) 95 N. W. 672; *Germania Nat. Bank v. Mariner,* 129 Wis. 544 (109 N. W. 574); *Liebscher v. Kraus,* 74 Wis. 387 (43 N. W. 166); *Citizens Nat. Bank v. Ariss,* 68 Wash. 448 (123 Pac. 593); *Megowan v. Peterson,* 173 N. Y. 1 (65 N. E. 738); *Jump v. Sparling,* 218 Mass. 324 (105 N. E. 878); *Somers v. Hanson,* 78 Ore. 429 (153 Pac. 43); *August v. Creque,* 72 Oh. St. 551

(74 N. E. 1073) ; *Miller v. Roach,* 150 Mass. 140 (22 N. E. 634) ; *Reeve v. First Nat. Bank,* 54 N. J. L. 208 (23 Atl. 853).

The mere addition of words to a signature, describing the signer as an agent or as filling a representative capacity, without disclosing his principal, does not relieve him from personal liability. This is specifically provided by Section 3060-a20; but "where the instrument contains, or a person adds to his signature, words indicating that he signs for or on behalf of a principal, or in a representative capacity, he is not liable on the instrument if he was duly authorized."

The name of the corporation, that is, "Consumers Twine & Machinery Co.," is affixed to the notes. This is followed by "Felsing" and "Waterbury," in the form stated above. If their signatures had been preceded by the word "by," there could be no possible question but that the designation of their representative capacity would be sufficient. The abbreviation "Pres.," affixed to the signature of Felsing, and "Secy.," to the signature of Waterbury, immediately following the name of the corporation, as clearly and definitely indicates their representative capacity as though their signatures were, in fact, preceded by the word "by." No one could possibly be misled by the omission of this or some other word connecting Felsing and Waterbury more explicitly with the Consumers Twine & Machinery Company. The abbreviations added to their signatures are sufficient, under the statute, to indicate that they signed in a representative capacity only, and did not intend to bind themselves personally. The form of the signature imported notice to transferees. As stated, seven of the notes were held by Estes, who intervened and asked judgment against the corporation and Felsing and Waterbury. The evidence clearly and conclusively showed that the transaction was with and on behalf of the corporation, and that Ballenger, Estes, and Woods all so understood it. The contract designated the Consumers Twine & Machinery Company as the party of the second part, and it is signed the same as the notes, except that Felsing did not indicate his official position. Neither Felsing nor Waterbury received any consideration whatever, personally, for the notes. It is true that, in the original petition filed by the corporation for a temporary writ to restrain the Thermo Company

from disposing of the notes, it was alleged that they were executed without the authority of the corporation; but it is alleged in the amended and substituted petition that they were executed for and on behalf of the corporation, and by the authority of the board of directors.

Any attempt to differentiate or harmonize the large number of cases cited, or to specifically point out wherein the court, as at present constituted, disapproves the result arrived at, would carry us beyond the reasonable length of a judicial opinion.  The statute has fixed a rule which the court must follow; and while precedents are, of course, helpful, the result in each case must, to a considerable extent, be determined upon the facts peculiar thereto.  We are always reluctant to overrule a principle established by our prior decisions or to express our disapproval of the result reached in any given case.  We are, however, so firmly and abidingly convinced that the conclusion arrived at in *Heffner v. Brownell, Day v. Ramsdell,* and a few other cases is wrong that we must decline to follow them as precedents.  We have already sufficiently pointed out our reasons for this conclusion.  It is only fair, in this connection, to say that the court below, in causing personal judgment to be entered against Felsing and Waterbury, was no doubt influenced by *Heffner v. Brownell* and the reference thereto by the majority in *Schuling v. Ervin,* supra.

It follows that the personal judgment against Felsing and Waterbury is set aside, and the cause as to them reversed.  In all other particulars, the judgment of the court below is affirmed.—*Affirmed in part; reversed in part.*

PRESTON, C. J., and DE GRAFF, J., concur.

WEAVER, J. (concurring).  I concur in the result reached in the foregoing opinion, but adhere to my dissent in *Schuling v. Ervin.*