A. M. BABB, Appellee, v. HERRING MOTOR COMPANY, Appellant.

**REFORMATION OF INSTRUMENTS:** Degree of Proof Required. Mutual mistake, in order to justify the reformation of a written contract, must be proven by clear, satisfactory, and convincing testimony. Evidence relative to a contract for commissions on the sale of automobiles reviewed, and held insufficient to establish *mutual* mistake.

*Appeal from Clarke District Court.*—P. C. WINTERS, Judge.

JANUARY 19, 1921.

ACTION at law to recover commissions claimed to have been earned by plaintiff upon three written contracts. Defendant filed answer and cross-petition, praying reformation of the terms of said contract. Trial upon this issue resulted in the dismissal of the cross-petition. Defendant appeals.—*Affirmed.*

*Carr, Carr & Cox* and *Clark, Byers & Hutchinson,* for appellant.

*O. M. Slaymaker,* for appellee.

STEVENS, J.—The conceded facts in this case show that the plaintiff, who resides at Osceola, in Clarke County, was the agent of the Ford Motor Company and defendant, for the sale of Ford automobiles, accessories, and supplies at that place, and also at Murray, Iowa, during the seasons of 1914-1915 and 1915-1916. The business at Osceola was conducted in the name of A. M. Babb, and at Murray in the name of Babb Murray Auto Company. Separate contracts for these agencies were entered into with the parties named above on October 29, 1914, and a single contract, covering approximately the same territory as that covered by the two prior contracts, on August 30, 1915. The contracts of October 29th covered the period to July 31,

1915, and the latter contract to July 31, 1916. Identical contracts were entered into for the season of 1913-1914, between the parties for the same territory, and an additional contract for an agency at Woodburn, a small town near Osceola, under the name of the Woodburn Auto Company. In each of said contracts, the Ford Motor Company is designated as the party of the first part, the Herring Motor Company as the party of the second part, and also as limited agent, and A. M. Babb and the Babb Murray Auto Company as party of the third part, and also as sublimited agent. Each of the several contracts provided for the payment of commissions to the party of the third part as follows:

"As third party's commission for making such sales of Ford automobiles, first party will, after payment by the purchaser allow to third party (except in the cases specified in Subdivision nine hereof) fifteen per cent (15%) of such full advertised list price, and will allow to third party such freight and delivery charges, and United States excise, if any, as aforesaid.

"First party agrees to allow and pay to third party the following additional commissions on the net amount of business he shall do hereunder during the term of this agreement upon Ford automobiles, but not on Ford parts, repairs or accessories, namely: No added commissions whatever when his said business shall total less than $5,000.00, but when the third party shall have done such business (not including freight charges and not including his fifteen (15%) per cent commission) * * * to the amount of $5,000.00, his right to additional commissions shall begin, and he shall be entitled to such added commission as follows: On all such business totaling less than $10,000.00, one (1%) per cent; if $10,000.00 and less than $20,000.00, two (2%) per cent on all such business; if $20,000.00 and less than $35,000.00, three (3%) on all such business; if $35,000.00 and less than $50,000.00 four (4%) per cent on all such business; if $50,000.00 or more, five (5%) per cent on all such business."

At the time of signing the contracts above referred to, plaintiff also signed releases attached to the contracts to the Ford Motor Company, and separate releases to defendant, in form as follows:

"Exhibit A. I hereby specifically agree to release the Ford Motor Company from any and all obligations to pay me rebate money which may be earned under this contract in accordance with lines Nos. 129 to 172 inclusive, and that said contract may be and is so amended, and that I will make claim for payment of any such rebate earned by me exclusively from the limited 'agent,' Herring Motor Company, Des Moines, Iowa. This agreement is attached to and made a part of contract dated October 29, 1914.

"Exhibit B. I hereby specifically agree to release and do release the Herring Motor Company from any and all obligations to pay me rebate money which may be earned under my contract with themselves and the Ford Motor Company of date October 29, 1914, and said contract is hereby amended in this respect as between myself and the Herring Motor Company.

"I further authorize the said Herring Motor Company to collect and receipt for any bonus earned under said contract and to indorse any drafts issued in payment of same."

Plaintiff, in his petition, which is in three counts, demands judgment against the defendant as follows: On Count 1, added commissions upon 3 per cent of the total net proceeds derived from the sale of Ford automobiles during the season of 1914-1915; in Count 2, upon 2 per cent thereof for the same period; and in Count 3, 3 per cent for the season of 1915-1916. To this petition the defendant, Herring Motor Company, filed answer and cross-petition, admitting the execution of the contract, but alleging that, by mutual mistake or oversight, neither of said contracts nor the releases to them express the true intention and agreement of the parties; and prayed the reformation thereof.

Defendant claims, and alleged in its answer, that the parties in fact specifically agreed that the added commissions allowed by said contracts should be collected and retained by defendant, but that, by mutual mistake or oversight, the words "third party," instead of "second party," were used in Paragraph 30 of said contracts, and that the words "and retain the same as its compensation under said contract" were omitted from the last paragraph of the several releases executed to defendant; and it prays that same be so reformed as to express the true agreement of the parties. The trial below was upon

the equitable issues thus tendered, the issues at law being continued until the final determination of this appeal.

A. R. Rockwell, sales manager, and C. L. Herring, general manager and president of the Herring Motor Company, were called as witnesses in defendant's behalf. From their testimony it appears that, during the time covered by the several contracts in question, the Herring Motor Company was the distributing agent of the Ford Motor Company at Des Moines, and handled Ford automobiles, accessories, and supplies, which it sold generally to sublimited agents throughout its territory; that, prior to the season of 1913-1914, an added commission was paid to defendant upon net sales of automobiles within its territory, the maximum of which was in excess of 5 per cent; but that for the seasons of 1914-1915 and 1915-1916, the maximum additional commission provided by its contracts with the Ford Motor Company was 5 per cent; and that it received no other or further commission from the sale of Ford automobiles. Releases for the season of 1913-1914 were taken by defendant, but were not signed, however, until in January, 1914; but they are also identical with the like instruments quoted above. The added commissions earned under the contracts above referred to were received by defendants from the Ford Motor Company, and paid to plaintiff and his subsidiary companies some time after the close of the season's business. All of the contracts and releases in controversy were presented to plaintiff by Rockwell, and signed by him in his presence, at the office of the Herring Motor Company at Des Moines. Rockwell further testified that he fully explained to plaintiff, when the contracts of October 29, 1914, were signed, that the Ford Motor Company had reduced the added commissions, or bonus, as it is sometimes called by the witnesses, payable to defendant under its contract therewith, to a maximum of 5 per cent; and that it was the intention of defendant to retain this commission for itself; and that the only commission plaintiff would receive was the 15 per cent upon the list price of automobiles sold; that plaintiff objected to this arrangement, but, after some discussion, and a conference with Mr. Herring, he agreed thereto, and signed the contracts and releases in controversy. He further testified that the question

of commissions was again discussed when the contract for 1915-1916 was signed, and the same agreement was entered into, and identical papers signed. Herring was not present at any of the conversations between plaintiff and Rockwell, but testified that plaintiff conferred with him before the contracts and releases were signed; that he explained to him that the Ford Motor Company allowed defendant but 5 per cent added commissions, and that it was necessary for defendant to retain the same to defray the expenses of the business; and that plaintiff finally agreed to waive his right to added commissions, and signed the contracts; and that, after suit was commenced, he stated that it was all right for defendant to retain the same.

Plaintiff specifically denies the conversation testified to by Rockwell and Herring, and testified that no such arrangement or agreement was entered into, but, on the contrary, claims that the following conversation occurred, at the time of signing the contracts of October 29th:

"When I came to prepare my contract in the year 1915, for the balance of the year and for 1916, I signed a release to the Ford Motor Company, and one to the Herring Motor Company. I asked him where the bonus was for the year, and he said, 'It will come along in due time.' Exhibit F is the one I signed to the Herring Motor Company, at the request of Mr. Rockwell. I do not remember whether I talked with Mr. Herring or not. I very seldom had any business with Mr. Herring. I always talked with Mr. Rockwell. He handled the territory, told us how many cars we got, and I paid Mr. Rockwell for the cars. I talked with Mr. Herring in 1912, when I first went up there, but do not think I ever did about the contracts. At the time I signed these two instruments, 29th of October, 1914, I said to Mr. Rockwell, 'Is it like it was last year, if I was to release it?' and he says, 'You got your money, didn't you?' I says, 'I wouldn't sign if I didn't get the money,' and he said, 'You got it last year, didn't you?' I read it through, and filled in the blank places, and I knew that it was intended to be a release of my added commissions for the ensuing year, just the same as the year before. We signed one to Ford, the year before."

He admits, however, that, some time after suit was brought,

he went to Des Moines, in response to a letter from the Herring Motor Company, and that the matter of commissions was then discussed between them, in the presence of one Minock, to the effect that, if the defendant received no other commission than the 5 per cent added commissions upon the sales made by him, it was all right for defendant to retain the same. He further testified that he would not have signed the contracts or releases, if defendant had demanded that the added commissions be paid to and retained by defendant.

It appears that the contracts and releases executed to the Ford Motor Company were furnished in blank form by the latter to the defendant, and that either Herring or Rockwell caused the blanks to be filled up, and the instruments signed by the sublimited agents. These papers, according to the testimony of plaintiff, were either prepared, ready for his signature, when he went to the office of defendant, or shortly thereafter. He took no part in the preparation thereof, although it appears that he filled in the date on some of the releases, at the time of signing the same. It is conceded by Herring and Rockwell that the reason for the execution of three contracts in 1913 was to reduce the amount of added commissions to be paid plaintiff. A reduction in the aggregate amount of added commissions earned by plaintiff resulted from the provision of the contract providing for a graduated rate: that is, the rate was fixed by the volume of business done. The law governing the reformation of written instruments is well settled, and need not be given extensive consideration in this opinion. The evidence of mutual mistake must be shown by clear, satisfactory, and convincing proof, and some cases declare that it must be free from doubt. *Noble v. Trump*, 174 Iowa 320; *Wagner v. Glick*, 177 Iowa 623; *Good Milking Machine Co. v. Galloway*, 168 Iowa 550.

It will be observed that the release to the Ford Motor Company is of any and all obligations to pay plaintiff rebate money, and that this language is identical with the first paragraph of the release to defendant. Plaintiff, in his testimony, used the words "bonus," "rebate," and "added commissions," interchangeably. It is conceded that the words "bonus" and "added commissions" refer to the same thing, but whether the word "rebate," as used in the releases, was intended by the parties

to be treated as synonymous therewith, we are not quite clear. Counsel, in argument, in referring to the commissions in controversy, sometimes add a reference to the testimony, in which they are also referred to as "rebates" and "bonuses." The release to the Ford Motor Company, which is attached to the original contract, refers to certain lines thereof, which doubtless fully explain the use of these terms; but the abstract does not show the original numbering of the lines of the contract. The ninth paragraph of the contracts in controversy refers specifically to certain rebates which the contract allows to plaintiff.

As stated above, defendant asks that the contracts be reformed by changing the word "third," italicized in the portion thereof quoted above, and by adding a clause to the last paragraph of the release to defendant, confirming in it the right to retain the added commissions. Referring further to the preparation of the contracts and releases, Mr. Herring testified as follows:

"I have had some experience as a dealer, in dictating understandings like that, and it was to be made as the paper shows. The contract between us and the Ford people was to be altered so that the additional bonus should come to us. I aimed to make the original contract different than it was. I ask the court to read this as I read it when I wrote it. I thought I had the contract as I intended it to be, and 150 dealers did not contest it, though most of them have been circularized."

Circumstances shown in evidence tend, to some extent, to support the claims of the respective parties. It will be observed that, notwithstanding the declarations of Rockwell and Herring that plaintiff objected to signing the contracts and releases for both seasons, and to permitting defendant to collect and retain the commissions, neither the contracts nor releases were changed in any respect before same were signed. This is true of all of the contracts involved in this controversy. No explanation is offered of the failure to change these instruments, which are identical with the contracts and releases signed by plaintiff for the season of 1913-1914, under which defendant paid the added commissions to plaintiff according to the provisions thereof. The reasons given for dividing plaintiff's territory so as to require three contracts would, upon his theory of the contracts,

be equally applicable to the two contracts executed for the season of 1914-1915. A different reason, however, is assigned by Rockwell. He testified that defendant desired to have a representative at Murray, as well as at Osceola, and that this was the reason for dividing the territory and making two contracts. The contract for the season of 1915-1916 reduced the territory by approximately one township in Union County, but included Murray. The commissions earned under this contract were much greater than the aggregate of commissions earned under the separate contracts for any prior season, and the commission proportionately greater. Rockwell further testified that but one contract was entered into in 1914, because the bonus or added commissions under it belonged to defendant, and not to plaintiff, and two contracts were unnecessary. It is further claimed by appellant,—and this the testimony tends to sustain,—that, if plaintiff recovers the commissions sought, defendant will receive no commission upon the sales made by him. It further appears that no demand was made by plaintiff upon defendant for the payment of the disputed commissions, until after the expiration of the last contract. In explanation of his failure to claim the commissions, at least at the time the last contract was signed, he states that he did not expect them to be paid until after the close of the season. It is true that the testimony of plaintiff is contradicted by Rockwell and Herring, and to some extent by Minock. The fact nevertheless remains that the original contract provides for the payment of added commissions to plaintiff, and that, notwithstanding the alleged discussion and the reluctance of plaintiff to sign the contracts of October 29, 1914, no change whatever was made therein, or in the subsequent contract. All of the releases signed by defendant were identical. These instruments were prepared in the office of defendant, in the absence of plaintiff, and the contract, according to its terms, could be modified or altered only in writing, with the approval of the Ford Motor Company. The Ford Motor Company is not made a party in this case. If reformation is granted, as prayed, the necessary effect of it will be to reduce the commissions allowed by the express terms of the contract to plaintiff from 2 to 5 per cent upon the net sales of automobiles on 1914 contracts and 5 per cent upon the contract for 1915.

The releases executed to defendant authorize it to collect the bonus earned by plaintiff under the terms of said contracts. One of the purposes, according to the evidence, for this authorization, was to enable defendant to collect the commissions as they came due, so as to have the use thereof in its business. We gather from the evidence that they amounted to a large sum upon the business of the territory controlled by defendant. Added commissions were paid without protest in 1913-1914. Defendant, on January 10th and again on July 21, 1914, wrote a letter to plaintiff, the Babb Murray Auto Company, and the Woodburn Auto Company, owned and controlled by him, inclosing releases to defendant, in all respects the same as those in controversy, with the request that same be signed and returned. These letters are substantially alike, and the one of January 21st is as follows, to wit:

"We enclose herewith a form of release of rebate, which we ask you to please sign and return to us at once.

"You will please understand that the execution of this release does not in any way release us from paying you the rebate which you will earn according to your contract, but does permit the Ford Motor Company to pay to us, as fast as earned upon our volume of business, the earned rebate. This in turn will permit us to settle with you direct, promptly, as fast as you have earned any rebate. This will avoid the long delays which we have heretofore had in securing for our dealers the rebate which their volume of business has earned them.

"We know you will not hesitate to accept us for this rebate, and we promise to let you have our check just as fast as your volume of business entitled you to such bonus.

"We repeat that we would like you sign and return this release to us at once, so that we may get this plan in operation, and we also repeat that you are in no way releasing us from our obligation of paying to you the amount of bonus which your volume of business earns you under your contract, and we further agree to pay such bonus as fast as earned."

It may be assumed that these letters correctly represent defendant's interpretation of the contracts, and, whatever may be the full legal effect thereof,—this we do not determine,—in the absence of a modification thereof, plaintiff might reasonably

expect that commissions in controversy would be paid to him. Ordinarily, parties skilled and experienced in the preparation and execution of written contracts make them express, substantially at least, the agreement intended. This is especially true if a controversy, which may result in a misunderstanding, arises before the execution thereof. Of course, upon defendant's theory, the alleged oral agreement and acquiescence of plaintiff in defendant's claim to the commissions for the season of 1914-1915 might account for the failure to change the contract for the following season, but new instruments were necessary for the season of 1915-1916, and it would seem that common prudence and ordinary business experience would have suggested the advisability of a change in the wording thereof, so as to leave no doubt of the scope and meaning thereof. We are not persuaded that the evidence offered by defendant to sustain its claim that the contracts do not express the true intention and agreements of the parties is so clear, convincing, satisfactory, and free from doubt as to justify the court in reforming same. It follows that the judgment and decree of the court below must be, and is,—*Affirmed.*

EVANS, C. J., ARTHUR and FAVILLE, JJ., concur.