FRANK A. CATALDO et al., appellees, v. JOHN J. COMPIANO et ux., appellants.

No. 48901.

(Reported in 76 N.W.2d 214)

APRIL 4, 1956.

REHEARING DENIED JUNE 22, 1956.

Herrick, Langdon & Sidney, of Des Moines, for appellants.

Hallagan, Irish & Burt, of Des Moines, for appellees.

BLISS, J.—Since the facts are important factors in the determination of this appeal they are set out in more fullness than usual. There is no controversy about the legal principles.

At the time of the trial, Frank A. Cataldo, age 41, was the sales manager of the furniture department in the Davidson store in Des Moines, Iowa, which position he had held for twenty years. He and John Randa were the original grantees in the deed involved herein, and on the death of Mr. Randa, his widow, plaintiff Doris Randa, succeeded to his interest in the property.

John J. Compiano, age 34, and the defendant Kay or Kathleen Compiano are husband and wife. Mr. Compiano and Mr. Cataldo had known each other for several years, but their relations had been limited to the sale and installation by Mr. Cataldo of furniture in the Compiano home at various times.

In June 1949 the defendants, as joint tenants with right of survivorship, received deed to the SW¼ of the NE¼ of Section 29, Township 78, Range 24, and other land, totaling

59 acres, in Polk County, Iowa. In July 1949 defendants laid out and secured the adoption by the city of Des Moines of "Green Ridge Knolls, an Official plat", containing a rectangular tract in the said forty acres, beginning 33 feet east of the northwest corner thereof, thence east approximately 533 feet, south 1315.3 feet, more or less, west 533 feet, and north to the place of beginning. A street known as Fleur Drive extends north and south along this line. The platted area was laid out for a residential addition and contained lots numbered 1 to 44 inclusive. The plat is situated east of Fleur Drive and between Frazier Avenue on the north and Porter Avenue to the south. The defendants, by warranty deed, conveyed to Polk County the areas needed for streets in the addition. One of the streets is Kenyon Drive which intersects Fleur Drive at right angles 425 feet south of the starting point of the Official Plat.

The lots involved in this litigation are numbered 38 and 39. Each lot has a length of 200 feet east and west. Number 39 lies directly south of Kenyon Drive and has a west frontage of 64.3 feet on Fleur Drive, and No. 38, lying directly south of No. 39, has a 60-foot frontage on the same street.

On September 27, 1949, defendants filed of record certain restrictions lettered "a" to "k" affecting lots 1 to 39 inclusive, most of which have no pertinence to this controversy. Restriction (a) is: "All lots described herein shall be known, described and used solely as residential lots, and no structure shall be erected on any residential building lot other than one detached single-family dwelling not to exceed two stories in height and a one or two car garage; except for lots 38 and 39, which lots shall be classed as light commercial but may be used for residential dwelling providing that if so used for residential purpose the same restrictions placed on lot 37 shall apply to lots 38 and 39."

Restriction (b) applied to locations and distances of buildings from lot lines. "* * * The restrictions of this paragraph applicable to lot 37 shall apply to lots 38 and 39 whether or not said lots are used for either commercial or residential purpose."

Restrictions (c), (d) and (e) are not pertinent to the issues in this case.

Restriction (f): "No building shall be erected on any lot unless the design and location is in harmony with existing structures and locations on the tract and does not violate any protective covenants. * * * Lots 38 and 39 shall be classified as commercial but may be used for residential dwellings and if used for residential purposes shall be considered residential building plots subject to the same restrictions as lot 37."

Restriction (g): "No noxious or offensive trade shall be carried on or upon any lot nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood."

Restriction (j) provides that any lot owner may take legal action at any time against any violator of any restriction or protective covenants.

In the promotion of this residential area or addition, and particularly lots 1 to 39 inclusive south of Kenyon Drive—lots 40 to 44 to the north inclusive do not belong to defendants— the defendants employed Cass & Company, consisting of A. E. Cass and his son. The elder Cass, age 60, had been in the real-estate and investment business for about 25 years. His undenied testimony was: "I plotted Green Ridge Knolls, and since early in 1949 I have been developing the subdivision out there and had charge of the sales. In fact, I have handled every sale that has been made."

The inception of the sale of lots 38 and 39 to plaintiff Cataldo and Mr. Randa was directly between Mr. Compiano and Mr. Cataldo. According to the latter, late in 1949 he personally delivered some furniture to the home of Mr. Compiano, and the latter inquired why he did not go into the furniture business himself. Compiano testified that he did not recall making such suggestion, but, shortly following, talks were had between them about the only two lots defendants had for commercial use— lots 38 and 39. A sale price of $3000 for the two lots was finally agreed upon, and a meeting at the Compiano home was arranged for the morning of January 6, 1950, between Cataldo, Cass and Compiano, for a full and definite discussion of the terms of the transaction and the construction and type of the proposed building. The testimony is too extensive to set out the

details, but its substance as given for the defendants was that the building was to be a one-story structure, not of cement or cinder blocks, but of a type and material that would be in harmony with the residences existing and to be constructed. Concerning this meeting in the morning of January 6, 1950, Mr. A. E. Cass testified:

"Mr. Compiano was late in getting up and Mr. Cataldo and I had coffee. I asked Mr. Cataldo what type of building he was planning to build on the lot, and it was going to be one of the finest furniture stores in the country, to be of stone, glass and brick. We then discussed the terms of the deal, when he wanted to pay the balance, and he thought probably by May or April 1st would be all right * * *. So we discussed the restrictions in the offer to buy. I went home and typed the offer to buy and those restrictions we had discussed, and took the offer down to Mr. Cataldo right after lunch. * * * It was our understanding that this glass and brick and stone was to be all the way around the building; brick on the sides of the building and stone and glass on the front. That is what Frank said."

In his direct examination about this meeting, Mr. Cass testified:

"All of the conversation about the sale of these lots to Mr. Cataldo relative to the use for which the property was to be devoted was about establishing a retail furniture business. It was said relative to the plans for the construction of the building that any plans were to be submitted to John Compiano before the plans could be built on the lot. It was said that if the plans were not approved the lot would revert back to John Compiano and he was to retain and have an option to repurchase the lots. The terms of the repurchase provided payment of $3000, which was the sale price, should be refunded, plus any amount Mr. Cataldo had paid in taxes, and this was also discussed. If Frank Cataldo had elected to sell the lot without undertaking to build thereon, he was to give written notice to John Compiano and Compiano would have 15 days in which to

repurchase the lot. The discussion of the sale and purchase of these two lots was entirely around the use of the lots for the furniture business, no other use was contemplated in our discussion; the conversation was very plain that it was to be used for a furniture store.''

The witness testified that immediately after this meeting in the Compiano home he prepared the offer to buy, Exhibit A, and after lunch about one o'clock of that day he took it to Mr. Cataldo in Davidson's furniture building and read the typed conditions and restrictions to him. The only objection Mr. Cataldo had to Exhibit A was to the provision that the purchaser agreed to not build nearer the front line than 65 feet. He wished a 60-foot setback. Mr. Cass was agreeable and interlined in lead pencil these words: " 'If impossible to use 65-foot setback for building plan, 60 feet may be used, but we prefer 65 feet if at all possible.' I wrote that while I was in his ·(Cataldo's) office at the time that he signed the offer.'' Mr. Cass also testified: ''There were no objections by Mr. Cataldo other than to the setback. There were no objections relative to the building restrictions and restrictive covenants in this offer. Mr. Cataldo at that time and place signed the offer to buy on both the front and back of the offer * * *. At that time he paid me $300. I went to the Valley Bank and purchased a cashier's check for A. E. Cass, Agent, for the $300 after depositing the cash.''

The testimony of Mr. Cass, quoted above, is corroborated and confirmed by the testimony of John Compiano and the written offer to buy Exhibit A and by the cashier's check of the Valley Bank and Trust Company dated January 6, 1950, payable to the order of A. E. Cass, Agent, for $300, stamped paid May 10, 1950, and bearing the indorsement: ''For Deposit to Credit of Green Ridge Knolls [signed], A. E. Cass, Agt.'' It is an item of the deposit slip of Green Ridge Knolls under date of May 9, 1950. Mr. Cataldo admitted the payment of the $300, but with the equivocation and contradiction found in all of his testimony. Once he testified: ''I paid Mr. Compiano $300''; at another time: ''I don't know to whom I paid the $300 whether to Mr. Cass or Mr. Compiano.'' Again: ''It was *after* the meeting in Mr. Belizzi's office.'' Later he said: ''It was

*before* the meeting in Mr. Belizzi's office." He testified that the meeting in Mr. Belizzi's office "was in December 1949", and at another time he testified: "It was anywhere from the first of January to the first of May, 1950." Mr. Ralph J. Belizzi's connection with this transaction was to examine the abstracts of title to the lots. His opinion on the title, dated May 1, 1950, stated that of the last continuation, April 14, 1950, at 7 a.m., the title was in the defendants. The record shows that Mr. Belizzi received the abstracts two or three days before May 1, 1950.

The offer to the defendants to buy lots 38 and 39 made by Mr. Cataldo and accepted by the defendants on January 6, 1950, recited that it was subject to the lettered restrictions in the abstract, some of which we have quoted, and also to "further restrictions placed in the terms of this offer to buy." These latter terms, other than as amended with respect to the "setback" of the building are:

"The following agreement is a part of the terms and a part of the consideration in the sale of the lots listed in this offer to buy and shall be binding on the purchaser until he establishes a retail furniture business on said lots. * * * (setback provision).

"It is understood and agreed that the purchaser herein is buying said lots for the sole purpose of erecting a building on said lots in which to operate a retail furniture business. That said building if and when constructed shall be of such type and design that it will be a credit to the community.

"The plans of said building shall be submitted to the present owners for approval before construction is started and if said plans are not approved, present owners reserve the right to refund the amount (paid) on said lots plus the amount paid as taxes on said lots and receive from the purchaser a quitclaim deed to said lots.

"It is further understood and agreed between the parties to this agreement that John J. Compiano shall have and retain an option, and the signing of this agreement by the purchaser hereby grants to the said John J. Compiano an option to re-

purchase said lots 38 and 39 in Green Ridge Knolls if the purchaser does not use said lots for furniture business, and in case of a sale of said lots to some other person it first must be offered to John J. Compiano in writing at the price of $3000 plus the amount paid as taxes on said lots, and if said option is not exercised within 15 days thereafter then said option shall be void and the property may then be sold to some other person."

The plaintiffs were given until April 1, 1950, to pay the balance of the purchase price, amounting to $2700. Plaintiffs having asked further time to make the payment it was granted. The warranty deed of defendants dated April 1, 1950, showing its execution and acknowledgment by defendants on that date, named Frank A. Cataldo and John A. Randa as grantees, the recited consideration paid as "the sum of Three Thousand Dollars & Other considerations" for the conveyance of "Lots 38 and 39 in Green Ridge Knolls, an Official Plat in Bloomfield Township, Polk County, Iowa, subject to building restrictions or easements of record. It is further agreed by the Grantors or Assigns that if the property above described shall be used for commercial purposes, a single building shall be erected thereon which shall be used exclusively as a retail furniture store. Plans for the erection of such a building shall, before construction is started, be submitted to the Grantors herein and if the same are unsatisfactory to the Grantors herein named, the said Grantors reserve the right to refund the purchase price herein provided for plus any taxes paid by the Grantee or Grantees and secure back from them a deed to said property. In addition to the restrictions hereinbefore referred to, the Grantees agree not to build nearer than sixty feet to the front lot line nor further than eighty feet from said front lot line.

"In the event that the Grantees herein decide to sell said property without erecting a furniture store or residence thereon, the Grantors shall be given fifteen days notice in writing in which to repurchase said property for the sum of Three Thousand Dollars, plus any taxes paid thereon by the Grantees herein named before said property may be sold to a third party."

This deed was delivered to and accepted by Mr. Cataldo

on May 8, 1950, at Davidson's store, and on that day Cataldo paid to defendants, through A. E. Cass, their agent, $2700, the balance of the purchase price, by a Davidson check for $1100, and a check by Frank Cataldo on the Capital City Savings Bank for $1600. As shown by a deposit slip of the Valley Bank and Trust Company issued to Green Ridge Knolls, bearing the date May 9, 1950, the two checks above noted and the $300 cashier's check, totaling $3000, the purchase price of the lots, were deposited to the credit of Green Ridge Knolls, in said bank. When the deed was delivered to Mr. Cataldo the restrictions therein were read to him by Mr. Cass and he testified that he also read the deed.

The separate abstracts of title to each lot certified to 7 a.m. of May 15, 1950, show that on July 28, 1949, there was filed of record a mortgage on the fifty-nine acres of land, including Green Ridge Knolls, for $18,000, executed by the defendants, which mortgage provides that on the payment of $500 on each lot the lien of said mortgage would be released on lots 28 to 39 inclusive. On May 3, 1950, such releases were executed by the mortgagee on lots 38 and 39 and filed of record on May 9, 1950.

It was the purpose and thought of the defendants that plaintiffs would promptly establish a furniture store that might be an inducement to new homeowners to buy lots in the addition. But nothing was done by plaintiffs until the summer of 1952 when they submitted Exhibit 4, a blueprint sketch of a one-story building with a front of 100 feet and 135 feet long, constructed of glass, brick and stone in front and for 22 feet on each side, with the remainder of the side walls and back wall constructed of cement blocks or of waylite brick, which is a sort of cinder-like cement block. Defendants objected to the cement and cinder blocks as contrary to the prior oral promises and to the provisions of the written offer to buy, and of the deed, and as out of harmony with the residences already completed; that such block construction would not be attractive or stand up, and they pointed out several buildings as evidence of this. Defendants therefore disapproved of the plans of the proposed building as provided for in Exhibit 4.

Between the time in the summer or fall of 1952, when Exhibit 4 was submitted to defendants, nothing further was done toward the construction of a building on lots 38 and 39 until July 15, 1954, when plans were submitted for a building with a second story on part of the ground floor. These plans, identified as Exhibit G, have not been certified to this court, but the evidence is that the side and back walls were to be constructed of cinder or cement blocks, as had been provided in Exhibit 4. Defendants disapproved of the plans for this reason and for the further reason that part of the structure was more than one story, which was contrary to all discussions between the parties. Plaintiff Cataldo denied that there was any such height restriction, but the testimony for defendants is to the contrary, and it is of pertinent significance that the first plan presented by plaintiffs, Exhibit 4, was for a one-story building. The matter of constructing a building had been prolonged for several months over four years, and defendants, considering that the matter should be brought to a conclusion, consulted with Judge Herrick of their present counsel, who, on August 20, 1954, in behalf of defendants, wrote a letter to Mr. Irish, of plaintiffs' counsel, tendering to plaintiffs the purchase price of the property plus taxes paid by plaintiffs for a conveyance of the property to defendants. Receipt of this tender is admitted by plaintiffs.

Thereafter, and on August 26, 1954, plaintiffs filed their petition in this action, admitting the execution of their offer to buy, Exhibit A, and their acceptance of defendants' deed, Exhibit B, and oral conversations between the parties prior to the execution of Exhibit A, but alleging as follows:

"But said offer by mistake or design on the part of said Compiano did not contain the provisions of the oral contract, but new and different terms and conditions than those agreed to by the parties. That when the same was presented to Frank A. Cataldo, together with the deed of the property * * * the same was rejected by the said Frank A. Cataldo for the reason that the same did not conform to the said oral agreement.

"That said Compiano advised the said Cataldo that although there were several mistakes and new conditions in both the offer

and the deed which did not agree with those of the oral agreement, particularly with respect of defendants' right to demand a retransfer of the property to the defendants and the defendants' right to reject any and all plans for the building, in the event the plans for the building were rejected by the defendants, or that the restrictions were to be permanent, and further states that the only restrictions to be enforced were the ones agreed to in the oral contract, to wit: that there was to be no restaurant, drive-in, or tavern on the premises; that plaintiffs were to build a building for a furniture store and the plans for the building were to be of such type and design as would be a credit to the community, and that if the plaintiffs would sign the offer to buy and accept the deed as drawn and comply with the terms and conditions agreed to in the said oral contract, and pay the purchase price of $3000, that was all the defendants wanted or expected of the plaintiffs, and that where the restrictions or conditions did conflict with those of the oral agreement or in any way affected or prevented plaintiffs from building or using the premises for the purpose for which it was intended, namely a furniture store, that the said conditions and restrictions objected to would be waived upon request by defendants.

"That the said Frank A. Cataldo relied upon the statements and assurance of the said John J. Compiano, and did sign the said offer to buy and accept the warranty deed."

The petition further alleges that the statements noted hereinabove as having been made by John J. Compiano to plaintiff Cataldo were false and were known by him to be false and were made for the purpose of deceiving plaintiff and inducing him to sign said offer and accept the deed to his harm, and that he believed them to be true and otherwise would not have signed said offer or accepted said deed. Plaintiffs allege that the deed should be reformed to comply with the oral contract by striking from its provisions, as herein set out, all after the words "commercial purposes" to and including the words "sold to a third party."

Defendants in their answer admit paragraphs 1 and 2 of plaintiffs' petition respecting the residence of the parties, and

defendants' platting and ownership of "Green Ridge Knolls"; also the execution of the offer to buy and the deed, copies of which were attached to the petition, and deny all other allegations.

The evidence is not of the character or sufficiency to sustain the quoted allegations of the petition. There is no evidence that plaintiffs at any time ever charged Mr. Compiano with fraud or deceit of any kind, or that anything was done through mistake. It is true that Mr. Compiano and Mr. Cass testified that on more than one occasion Mr. Cataldo had asked them to waive or eliminate all restrictions from the deed because he was having difficulty financing the construction of the building, but he requested this as a favor and not as a right or because of any wrongdoing on the part of Mr. Compiano or of Mr. Cass. After the preliminary talks practically all matters in the transaction were attended to by Mr. Cass, except the approval or disapproval of any building plans was left to Mr. Compiano. No allegation or claim of fraud or wrongdoing is made against Mr. Cass. Both he and Mr. Compiano testified that neither when the offer to buy nor when the deed was presented to Mr. Cataldo did he object to either or have a telephone conversation with Mr. Compiano in which the latter told Mr. Cataldo that he would waive all or any building restrictions and for Mr. Cataldo to accept the deed. The only evidence to support this contention of Mr. Cataldo is *his* testimony. In direct examination he testified:

"I don't know exactly when the deed was brought to me, but to the best of my recollection it was in the latter part of January or the first part of February. Mr. Cass brought the deed down to me. It was the first time that I had any dealings with Mr. Cass. (Note. Mr. Cass was in the conference on January 6, 1950, and delivered the offer to buy to Mr. Cataldo on that date. The deed in fact was delivered May 8, 1950, and Mr. Cataldo had it filed for record the following day.) The meeting between him and me took place at Davidson's. I read the deed over and stated to Mr. Cass that the deed was not actually the agreement that Mr. Compiano and I had because it limited me

to just a furniture store. Mr. Cass said that was the only way they would sell the land to me. I called Mr. Compiano and said the deed did not sound like we had originally agreed. Mr. Compiano said to me, 'Don't worry about it, when the time comes we will take care of you. The only thing I am definitely interested in is that a tavern, restaurant, drive-in doesn't go in on that ground.' So I went ahead and paid him. * * * He said 'Go ahead, take care of it, the only thing is you have got to see my position in it because I have to be protected.' I said, 'All right, John, if that is the case, I will go along with you. I mean, your word is good enough for me.' "

On redirect examination, Mr. Cataldo testified: "When I first took Exhibit G to either Mr. Cass or Mr. Compiano, they said they didn't want a cement block building up there because it would spoil the effects of the plot. I told them I would go along with them, although it would take a lot of money to finance that kind of a building. I told them I would build it out of face tile and an attractive roman brick front. They said that would be all right, they agreed that the sides and the back should be of face tile."

In rebuttal, Mr. Cataldo's testimony was:

"Q. Just tell me then what Mr. Compiano said to you on that occasion over the telephone? A. 'Don't worry about it, when the time comes it will be taken care of. You know what I am interested in, I can't afford to have you put in a restaurant, drive-in or tavern.' "

Plaintiffs repeatedly stressed this particular, purported objection or condition as the chief one urged by defendants. It is alleged in the petition and is repeatedly reiterated in the testimony for plaintiffs.

Mr. Compiano made the sensible answer to this contention: "The only way I would sell to him was under these restrictions, if he didn't build a building to suit us, only for a furniture store, I would have the right to buy them back. All I wanted in there was a furniture store. I did not say all I cared about was a drive-in, tavern or restaurant. All he was interested in at that time was a furniture store, and I agreed on it."

· Neither plaintiffs nor defendants contemplated anything else. Plaintiff Cataldo had spent his adult years in the furniture business. He wished to continue it in a venture of his own. Neither he nor Mr. Compiano nor Mr. Cass anticipated the building of a tavern nor a restaurant, nor a drive-in nor a motor-vehicle service station. Directly north of lots 38 and 39 across Kenyon Drive at its intersection with Fleur Drive was such a service station operated by Joe Compiano, brother of John, who owned all of the lots north of Kenyon Drive. No one would reasonably contemplate going into the same business on the southeast corner of the same intersection. There is no reasonable basis in the evidence that gives the slightest support to plaintiffs' allegations that Mr. Compiano went into this transaction to deceive and defraud plaintiffs.

In the trial court's findings of fact it stated that the "plans were not given due and careful consideration by the said John J. Compiano, but which were rejected without an honest and good faith consideration of said plans or an attempt to in good faith indicate dissatisfaction and disapproval."

In its conclusions of law the trial court said: "That in approving or disapproving any plans submitted for the construction of the furniture store, it was the duty of the defendant John J. Compiano to act honestly, reasonably and in good faith. * * * It is the court's conclusion that it would be inequitable to permit defendants to recover as prayed in their cross-petition, as the mistakes contained in Exhibit B were the result of their agent's act, and for the further reason that the defendant John J. Compiano and his agent, A. E. Cass, have not acted in good faith in disapproving the plans submitted to them for the construction of the furniture store building."

In its decree the court adjudged "that the defendants were primarily interested in not having an oil station, drive-in, restaurant, or tavern established on the said premises."

The court further adjudged, in accord with its findings of fact and conclusions of law, that in the telephone conversation the defendant John J. Compiano assured plaintiffs "that no difficulty would arise because of the restrictions on the back of said offer. * * *" and that "John J. Compiano, and his agent, A. E.

Cass, have not acted fairly, reasonably, and in good faith in disapproving the plans submitted to them for the construction of the furniture store building."

It is to be noted that while the plaintiffs and the court come to the same final conclusion, each takes a different approach and path in reaching it. The court purports to reform the deed to accord with the written offer to buy, Exhibit A, for it states in the decree:

"That the said deed includes several restrictions in addition to those of record, and by a comparison of the restrictions set out in the deed with those set out in the offer to buy, it is readily apparent the restrictions set out in the deed do not express the true agreement and understanding of the parties, and are in several respects in direct conflict with the provisions set out in the offer to buy. * * *

"It Is Therefore Ordered, Adjudged And Decreed that the restrictions concerning the erection, use and occupancy of the building as set out in the deed are hereby reformed, and that the restrictions agreed to by the parties, * * *, are therefore to be given full force and effect."

From the inception and throughout the proceeding plaintiffs seek to reform the deed to their conception of the oral conferences. The petition alleges with respect to Exhibit A: "But said offer by mistake or design on the part of said Compiano did not contain the provisions of the oral contract, but new and different terms and conditions than those agreed to by the parties."

The final verbal discussion of the terms and provisions of the agreement was concluded in the morning of January 6, 1950. The parties properly concluded that the agreement should be evidenced by a written instrument, and Mr. Cass prepared the written offer to buy which was presented to plaintiffs and was signed by them on each of its two pages, and the offer was then accepted by defendants, all on January 6, 1950. The plaintiffs read the instrument and knew its contents, as at their suggestion an amendment was interlined.

The prayer of plaintiffs' petition is "that said Warranty

Deed be reformed to comply with the oral agreement * * *." In plaintiffs' answer to defendants' cross-petition, they "deny that said written agreement expresses the true agreement between the parties."

The court in its conclusion, findings and decree says nothing about plaintiffs' allegations of fraud, mistakes or false representation, but emphasizes defendants' unfairness and lack of good faith in disapproving the two plans presented by plaintiffs. We have pointed out the long delay and lack of diligence by plaintiffs in putting into execution the provisions of Exhibit A. They delayed presenting any plan over two years, and although plaintiffs did not submit the plans, Exhibit G, until July 1954, they admitted they had them in their possession for two years before. They finally offered to erect a building of stone, brick and glass in the front wall and back 22 feet on each side wall and face tile on the remainder of the side walls and the back wall, and testified that this was agreeable to defendants, yet they never presented any plans for such construction. If there was any bad faith on the part of either party, the plaintiffs are the ones to be charged with it. The court found and decreed that the offer to buy expressed the true contract and should be enforced, and yet it failed to mention that both the offer to buy and the deed contained the provision that if any plan submitted to defendants was disapproved they had the right to tender to plaintiffs the purchase price and the amount of any taxes paid by plaintiffs for a return of the property. Instead the court denied defendants a reconveyance of the property to them.

We find no sound basis in the record or the evidence for the findings of fact, conclusions of law or adjudications of the trial court adverse to the defendants. The defendants were promoting an addition for the building up of a desirable residential area. Homes were built and being built at substantial cost. These lots had been purchased on assurances from defendants that they would not permit anything that was not desirable in appearance in the addition. The restriction against a two-story commercial building on lots 38 and 39 was not unreasonable

nor unfair, as fine homes had been built near them and the occupants did not wish such a structure to interfere with their view. Mr. Cass testified:

"To have a successful subdivision you must know what is to go in, because if a man builds a $25,000 house and then a person wishes to build an $8,000 house beside it, we are in trouble. Some of the deeds we have issued covering the residential lots to purchasers provide that plans are to be submitted before they take title to the property. Some of them do not. If we refuse to approve the plans, on quite a lot of them, we have the option to repurchase the property. They submit all of their plans to us for approval. It is not in the deed, but it is in the offer to buy. I would say that probably the cost of the building is in 65% of our deeds."

Defendants owed a duty to keep faith with those who had bought lots and improved them at large expense. We do not agree with the repeated statements of the trial court that the plans submitted to defendants "were not given due and careful consideration by them, but which were rejected without an honest and a good faith consideration of the said plans or an attempt to in good faith indicate satisfaction and disapproval. * * * and that the defendant John J. Compiano and his Agent, A. E. Cass, have not acted fairly, reasonably, and in good faith in disapproving the plans submitted to them for the construction of the furniture store building."

The plan, Exhibit G, was not submitted until July 15, 1954, over four years after plaintiffs' offer to buy was executed by them and accepted by defendants. Defendants rejected the first plan because it specified cement or cinder blocks for the rear and side walls. Exhibit G called for the same type of construction. Defendants did not reject it hastily. Mr. Compiano testified:

"I wasn't too happy with the plans in 1954. I took them to Mr. Cass. I did not want to approve a two-story building. We talked about a one-story building, because of the lots next to it, because of the houses behind it. Mr. Cass and I came to your office (Mr. Herrick) with regard to this matter. We defi-

nitely concluded we would not approve these plans, identified as Exhibit G. We came to the conclusion that we would ask for a return of the lots from Mr. Cataldo and that we would refund the money, in accordance with the provisions of our original agreement."

Mr. Herrick, for his firm, on August 20, 1954, by letter of that date, made the tender.

I. The trial court rightly concluded that in seeking to reform the offer to buy and the deed the burden was upon the plaintiffs to establish the material allegations of their petition by clear, satisfactory and convincing evidence, and this is true whether the alleged error was brought about by fraud, overreaching or mistake. Babb v. Herring Motor Co., 190 Iowa 814, 819, 180 N.W. 901; Hubbard Grain Co. v. Western Grain Dealers Mut. Fire Ins. Co., 199 Iowa 1160, 201 N.W. 568; Eglin v. Miller, 209 Iowa 326, 329, 228 N.W. 305; Allemang v. White, 230 Iowa 526, 530, 531, 298 N.W. 658; Good Milking Machine Co. v. Galloway, 168 Iowa 550, 558, 150 N.W. 710; Rate v. Ryan Bros., 199 Iowa 1050, 1052, 203 N.W. 13; Rensink v. Wiggers, 99 Iowa 39, 41, 68 N.W. 569; Montgomery v. Mann, 120 Iowa 609, 611, 94 N.W. 1109; Fitch v. Flinn, 198 Iowa 823, 826, 200 N.W. 402; Johnson v. Farmers Ins. Co., 126 Iowa 565, 570, 102 N.W. 502; Exchange Bank of Marcus v. Schultz, 167 Iowa 136, 138, 149 N.W. 99; Chicago Title & Trust Co. v. Smyth, 94 Iowa 401, 405, 62 N.W. 792; Stewart v. McArthur, 77 Iowa 162, 166, 41 N.W. 604; Rankin v. Taylor, 204 Iowa 384, 387, 214 N.W. 725.

We have in some opinions departed from the use of the words "clear, satisfactory and convincing evidence" and have used words expressing a higher degree of proof than these words. We note some of these cases: Hervey v. Savery, 48 Iowa 313, 319, "unquestionable and free from reasonable doubt." Other cases holding that the evidence should be "beyond reasonable doubt" are Marshall & Sharp v. Westrope, 98 Iowa 324, 332, 67 N.W. 257; Gelpcke, Winslow & Co. v. Blake, 15 Iowa 387, 389, 390, 83 Am. Dec. 418; Murphy v. First National Bank of Cedar Falls, 95 Iowa 325, 329, 63 N.W. 702; First Presbyterian Church of Logan v. Logan, 77 Iowa 326, 328, 42 N.W. 310. These opinions

state a degree of proof that is excessive and higher than sound law requires in cases of the kind under consideration in this appeal. The requisite degree of proof is correctly expressed by the term, "clear, satisfactory and convincing evidence."

 Plaintiffs have not met the high degree of proof required by any of these holdings. Mr. Cataldo, as we have noted, by his verbatim testimony, admitted that he agreed with defendants during the controversy to put facing tile on the side walls and the back wall. He never attempted to perform this agreement.

 II. The covenant to reconvey was a part of the agree-, ment between the parties and should have been enforced by the trial court. It was in both the offer to buy and the deed and the court reformed the deed to conform with the offer to buy. The question on appeal is not whether or not the covenant to reconvey was a part of the agreement between the parties, but rather whether or not this part of the agreement should be enforced. Two factors were the basis of the objections to the plans: cement-block construction and the two-story height.

Similar factors were involved in the case of Hollingsworth v. Szczesiak, 32 Del. Ch. 274, 281, 84 A.2d 816, 820. Objection was made to both the concrete-block construction and the height of the building as violating restrictive covenants. The foundation was in and the walls were two or three feet high when plaintiffs first learned of the violations, and the building was substantially completed when construction was stopped by injunction. In upholding the contentions of plaintiffs, the vice-chancellor said of the construction:

"Does it comply with the restrictive covenants? I think not. The purpose of a general plan of development, with restrictive covenants against the different properties to enforce such a plan, is ultimately to develop a community in which the individual structures and ground plans will blend harmoniously * * * in forming an attractive residential community. Placing the building with a construction largely of concrete block instead of red brick, a flat roof instead of a sloping roof, of considerably larger size and somewhat higher than the usual two-car private garage, and with an unusually large entrance for the truck, in a strictly

residential community in which practically all the other residences and ground plans are harmonious would leave the defendants' building striking in its unlikeness to the community as a whole."

In that case defendants had violated a restriction requiring them to submit building plans for approval.

In Porter v. Farmers & Merchants Savings Bank, 143 Iowa 629, 120 N.W. 633, plaintiff demanded specific performance of a covenant to reconvey, which the trial court denied. This court reversed.

In 81 C. J. S., Specific Performance, section 63, pages 567, 568, it is stated: "Specific performance may be granted as to an agreement by vendee, or mortgagee, to reconvey, or of a covenant to reconvey on the grantee's failure to perform certain conditions, or on the happening of a specified event."

Other decisions upholding the right to enforce agreements to reconvey for stipulated grounds are Kozlowski v. Mussay, 395 Ill. 81, 69 N.E.2d 338; Dodd v. Rotterman, 330 Ill. 362, 161 N.E. 756; Jepson v. Conner, 210 Iowa 1267, 232 N.W. 693, and cases cited; Jones v. Northwest Real Estate Co., 149 Md. 271, 131 A. 446; Parsons v. Duryea, 261 Mass. 314, 158 N.E. 761; Harmon v. Burow, 263 Pa. 188, 106 A. 310; Hannula v. Hacienda Homes, Inc., 34 Cal.2d 442, 211 P.2d 302, 19 A. L. R.2d 1268.

Defendants were entitled to the relief prayed for in their cross-petition.

The judgment and decree of the trial court is reversed and the cause is remanded for decree in conformity herewith.—Reversed and remanded.

All Justices concur.